```
 1                                  THE UNITED STATES DISTRICT COURT
                                    FOR THE DISTRICT OF NEW JERSEY
 2                                  CIVIL ACTION NO. 09-2073 (WJM)
        - - - - - - - - - - - - - - - - - x
 3                                         :
        WARNER CHILCOTT LABORATORIES        :        TRIAL
 4      IRELAND LIMITED, MAYNE PHARMA       :
        INTERNATIONAL, PTY, LTD.,           :     TRANSCRIPT
 5             Plaintiffs,                  :        OF
                -v-                         :     PROCEEDINGS
 6                                          :
        MYLAN PHARMACEUTICALS, INC., and   :   (MORNING SESSION)
 7      MYLAN, INC.,                        :
                    Defendants.             :
 8      - - - - - - - - - - - - - - - - - :
        WARNER CHILCOTT LABORATORIES        :
 9      IRELAND LIMITED, MAYNE PHARMA       :
        INTERNATIONAL, PTY, LTD.,           :
10             Plaintiffs,                  :
                -v-                         :
11                                          :
        IMPAX LABORATORIES, INC.,           :
12             Defendant.                   :
        - - - - - - - - - - - - - - - - - x
13                           February 8, 2012
                             Newark, New Jersey
14
        B E F O R E:   HONORABLE WILLIAM J. MARTINI, U.S.D.J.
15
        A P P E A R A N C E S:
16
                     PITZPATRICK, CELLA, HARPER & SCINTO, ESQS.,
17                   BY:   DOMINICK A. CONDE, ESQ.,
                           DIEGO SCAMBIA, ESQ.,
18                         GREGORY B. SEPHTON, ESQ.,
                                   &
19                   MC CARTER & ENGLISH, ESQS.,
                     BY:   JOHN E. FLAHERTY, ESQ.,
20                   Attorneys for the Plaintiffs

21                   SAIBER, LLC, ESQS.,
                     BY:   ARNOLD B. CALMANN, ESQ.,
22                         GERI L. ALBIN, ESQ.,
                                   &
23                   WILSON, SONSINI, GOODRICH & ROSATTI, ESQS.,
                     BY:   LARRY L. SHATZER, ESQ.,
24                         TUNG-ON KONG, ESQ.,
                     Attorneys for the Defendant Mylan
25
```

```
 1

 2

 3
                    LITE, DE PALMA, GREENBERG, LLC, ESQS.,
 4                  BY:  MICHAEL E. PATUNAS, ESQ.,
                              &
 5                  WILEY REIN, LLP, ESQS.,
                    BY:  ERIC H. WEISBLATT, ESQ.,
 6                       MARK A. PACELLA, ESQ.,
                         ROBERT J. SCHEFFEL, ESQ.,
 7                  Attorneys for the Defendant Impax

 8

 9

10

11
     ANYONE INTERESTED IN PURCHASING A COPY OF THIS TRANSCRIPT
12   MAY CONTACT JOHN STONE 973 824-4483 - jkstoneage@verizon.net

13

14

15   _____
     Purusant to Section 753 Title 28 United States Code, the
16   following transcript is certified to be an accurate record
     taken stenographically in the above entitled proceedings.
17

18

19   s/ John K. Stone
     _____
20   JOHN KEVIN STONE,
     Official Court Reporter
21

22

23

24

25
```

1

I_N_D_E_X

2
WITNESS          DIRECT   CROSS   REDIRECT   RECROSS

3
ANDRE J. SOMMER

4
By Mr. Scheffel:  6
5    By Mr. Conde:              49

6
ARTHUR H. KIBBE
7
By Mr. Pacella:   79
8

9
E_X_H_I_B_I_T_S

10
NUMBER              DESCRIPTION              ID
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  All rise.

 2              THE COURT:  All right.

 3              Everyone be seated.

 4              All right.  Everyone, good morning.

 5              We have another witness on the stand.

 6              Good morning.

 7              MR. CONDE:  Good morning.

 8              Two quick housekeeping matters, the long awaited

 9         Temporary Restraining Order language.

10              THE COURT:  Yes.

11              MR. CONDE:  And also yesterday, during Dr. Elder's

12         cross we marked up some images, and we've taken the

13         originals and put stickers on the back and identified them

14         as Defendant's Exhibit 468 A and 469 A, and I also have some

15         additional copies.

16              THE COURT:  All right.

17              Has counsel seen --

18              MR. CONDE:  I've given a copy to counsel as well.

19              MR. SHATZER:  I have, Your Honor.

20              THE COURT:  All right.  Fine.

21              MR. CONDE:  These are the originals.

22              THE CLERK:  Okay.

23              MR. CONDE:  I copies of the two sets.

24              THE COURT:  Okay.  I'll read it while you're going

25         ahead.
```

```
 1                    MR. CONDE:  Thank you, Your Honor.

 2                    And just so the record's clear, the stamps on those

 3         are on the back of the images.

 4                    THE COURT:  These the ones from yesterday?

 5                    MR. CONDE:  Yes, Your Honor, from Dr. Elder's

 6         cross-examination.

 7                    THE CLERK:  I have the originals.

 8                    THE COURT:  You have them, Gail?

 9                    All right.  Thank you.

10                    You have these?

11                    THE CLERK:  I have the originals.

12                    THE COURT:  These are extra copies.

13                    THE CLERK:  Yes.

14                    THE COURT:  Okay.  Fine.  Thank you.

15                    Will you identify the witness, please.

16                    MR. SHATZER:  Your Honor, I had one minor point,

17         the Court's admitted order yesterday noted Mylan had rested

18         and we had just finished our infringement case, we still

19         have the invalidity case.  I just wanted the record to be

20         clear on that.

21                    THE COURT:  No, no.  That's fine.  I understood.

22                    But thank you for clarifying.

23                    Please go ahead.

24                    MR. SCHEFFEL:  Morning, Your Honor.

25                    THE COURT:  The -- Impax is still on the
```

```
 1      infringement case?

 2              MR. WEISBLATT:  Yes, Your Honor.

 3              THE COURT:  We're back to the invalidity.  Good.

 4              MR. SCHEFFEL:  Morning, Your Honor.

 5              Robert Scheffel on behalf of Impax Labs, and our

 6      next witness is going to Dr. Andre Sommer.

 7              THE COURT:  All right.

 8              THE CLERK:  Place your left-hand on the Bible,

 9      raise your right hand.

10      D R.    A N D R E    J.   S O M M E R, sworn.

11              THE CLERK:  Please state your full name and spell

12      it for the record.

13              THE WITNESS:  Andre Johanns Sommer, A-n-d-r-e,

14      J-o-h-a-n-n-s, S-o-m-m-e-r.

15              THE CLERK:  You may be seated, sir.

16              THE WITNESS:  Thank you.

17      DIRECT EXAMINATION

18      BY MR. SCHEFFEL:

19      Q    Morning, Dr. Sommer?

20      A    Morning.

21      Q    Can you briefly explain your educational background for

22      the Court?

23      A    Yes.  I received a Bachelor of Science Degree in

24      chemistry from Delaware Valley College in 1979.

25              I then received a Master of Science Degree in
```

 1    physical chemistry from Lehigh University in 1981.

 2              And then in 1985 I received a PhD in philosophy

 3    specializing in analytical chemistry from Lehigh in again

 4    1985.

 5    Q    Where are you currently employed?

 6    A    I'm currently employed at Miami University as a

 7    professor of chemistry and biochemistry.  And I'm also the

 8    Director of the Molecular Microspectroscopy Laboratory.

 9    Q    And how long have you been at Miami University?

10    A    I've been at Miami since 1986.

11    Q    And at Miami what does your research focus on?

12    A    At Miami my research focuses on the development and

13    characterization and application of molecular

14    microspectroscopies for surface analysis and materials

15    characterization.

16    Q    And do you focus your work on any particular type of

17    microspectroscopy techniques?

18    A    Yes.  In particular, infrared microspectroscopy and

19    pertinent to this case attenuated internal reflection

20    imaging or ATR-FTIR imaging spectroscopy.

21    Q    And do you teach classes at Miami as well?

22    A    Yes, I do.

23    Q    What classes do you teach?

24    A    So I teach general chemistry at the undergraduate level,

25    and at the graduate level I teach microspectroscopy,

```
 1      micro-molecular spectroscopy surface analysis methods and

 2      optical microspectroscopy.

 3      Q    And in addition to what you referred to as ATR-FTIR

 4      imaging, do you focus on any other techniques?

 5      A    Yes, I use scanning electron microspectroscopy coupled

 6      with internal energy dispersal spectroscopy and imaging.

 7      Q    And you earlier just mentioned the molecular

 8      microspectroscopy lab?

 9      A    Yes, the MML.

10      Q    What did the -- does the MML do?

11      A    The MML is a contract or research development lab where

12      we help companies solve intractable problems.  So we

13      specifically we look at very, very small particles, either

14      isolated or small spatial domains on much larger samples.

15      With some of the instrument manufacturers we actually help

16      them develop new instruments and new accessories.

17      Q    And does the MML routinely handle small samples?

18      A    Yes.  We routinely handle isolated particles down to 10

19      microns in size.

20      Q    You mentioned that you developed techniques.

21           Can you give the Court an example of a novel

22      technique you invented?

23      A    Yes, we co-developed the ATR-FTIR imaging method with

24      Proctor & Gamble and later with Perkin Elmer.

25      Q    And how long have you been focusing on your research on
```

1       ATR-FTIR imaging?

2       A    Since 1985.

3       Q    Have you published articles in the area of electro

4       microspectroscopy.

5       A    Yes, I have.

6               I've published 75 articles in New York, I have

7       eight book chapters in roughly 180 publications or

8       presentations in the field.

9       Q    And do you have a slide that identifies some of the

10      articles that are pertinent to your testimony in this case?

11      A    Yes, I do.

12      Q    Could you put up slide one, please.

13      A    So, the pertinent articles in this case, you'll notice

14      that in 1991 we published the very fundamental article on

15      the spatial resolution that you can achieve in infrared

16      microspectroscopy.

17              We later in 2001 published the seminal paper on the

18      development of the ATR-FTIR imaging method.

19              We then applied that method to look at very, very

20      small mineral inclusions in kidney biopsies and that was a

21      paper in 2010.

22              And these papers here, this one and this one

23      (indicating), we published in conjunction with the trace

24      evidence analysis section of the Food and Drug

25      Administration and those are specifically looking at

```
 1    pharmaceutical compositions.

 2              MR. SCHEFFEL:  Will you put up the ITX 617.

 3    BY MR. SCHEFFEL:

 4    Q    Do you recognize ITX 617?

 5    A    Yes, I do.

 6              MR. CONDE:  Excuse me, do you have a witness book?

 7              Thank you.

 8              MR. SCHEFFEL:  Your Honor, may I approach?

 9              THE COURT:  Please.

10              MR. SCHEFFEL:  My apologies, Your Honor.

11              THE COURT:  No, that's all right.

12              If you could give a copy to the clerk.

13              MR. SCHEFFEL:  It's early for me.

14    BY MR. SCHEFFEL:

15    Q    Dr. Sommer, do you recognize ITX 617?

16    A    Yes.

17              This is the article that developed -- detailed the

18    the development of the ATR-FTIR imaging method, and in this

19    paper we looked at various materials, we looked at the

20    surface of hair fibers to get chemical distribution and we

21    also looked a single red blood cell.

22              MR. SCHEFFEL:  Will you put up ITX 619.

23    BY MR. SCHEFFEL:

24    Q    Dr. Sommer, do you recognizes ITX 619?

25    A    Yes.  This is the paper that we published with Indiana
```

```
 1            University Medical School over in Indianapolis, and this is
 2            where we actually looked at very, very small mineral
 3            inclusions, actually the first start of formation of kidney
 4            stones, in order to kind of figure out why kidney stones
 5            actually form.
 6       Q    Do you recognize ITX 618, Dr. Sommer?
 7       A    Yes.  This is where we did ATR-FTIR imaging to look at
 8            counterfeit pharmaceutical tablets, specifically to identify
 9            counterfeit materials in the core of the tablets.
10       Q    Now, Doctor, in addition to your work at Miami, what
11            other things do you do?
12       A    Since 1995 I've been consulting with various companies.
13       Q    So how long have you been focusing on electron
14            microspectroscopy?
15       A    Since 1981.
16       Q    Have you ever testified as an expert witness at trial
17            before?
18       A    No, this is my first time.
19       Q    And do you have a curriculum vitae that provides
20            additional details of your educational and professional
21            background?
22       A    Yes, I do.
23            MR. SCHEFFEL:  Can you put up ITX 638, please.
24       BY MR. SCHEFFEL:
25       Q    Dr. Sommer, do you recognize that document?
```

```
 1    A    Yes, that is -- that is my curriculum vitae.
 2              MR. SCHEFFEL:  Your Honor, at this point I would
 3    like to offer the doctor as an expert in ATR, including
 4    ATR-FTIR imaging and SCM techniques.
 5              MR. CONDE:  No objection, Your Honor.
 6              THE COURT:  All right.
 7              Without objection he's so qualified to testify.
 8    BY MR. SCHEFFEL:
 9    Q    Dr. Sommer, can you briefly tell the Court what you were
10    asked to consider in this case?
11    A    Yes.
12              I was asked to look at the Impax delayed release
13    seeds and determine the molecular or chemical distribution
14    from the surface of the seed all the way into the core.  In
15    particular, I was asked to opine on whether there was a HPMC
16    derived material enriched in talc in between the delayed
17    release coating and the core.
18    Q    And can you provide a brief summary of your opinions for
19    the court?
20    A    Yes, I can.  I have a slide on that.
21              MR. SCHEFFEL:  Put up the slide, please.
22    A    So using ATR-FTIR imaging and scanning electron
23    microspectroscopy with energy dispersive spectroscopic
24    imaging, I found that the delayed release seeds and talc
25    randomly distributed throughout a single layer.  There is no
```

```
 1      evidence of a talc region near the core, and there is no
 2      chemically different and topographically stabilising coat
 3      layer of some unspecified HPMCP derived material enriched in
 4      talc.
 5      Q    Dr. Sommer, in connection with your work in this case,
 6      did you review the patent in suit?
 7      A    Yes, I did.
 8      Q    Did you review the Court's claim construction in this
 9      case?
10      A    Yes, I did.
11      Q    And do your opinions take into account the Court's claim
12      construction --
13      A    Yes.
14      Q    -- as made here?
15      A    Yes, they do.
16      Q    Let's discuss some of your opinions in more detail.
17      What analytical methods did you elect to use in this case?
18      A    I used ATR-FTIR imaging and I also used energy
19      dispersive spectroscopy along with imaging.
20      Q    And to your knowledge, did anyone else in this case
21      utilize ATR-FTIR imaging?
22      A    No, it's -- to my knowledge, no one else has used this
23      method.
24      Q    Did anyone else in this case use SCM EDS analysis?
25      A    No one else used SCM EDS imaging.
```

```
1    Q    In what form did you analyze the delayed release seeds?
2    A    We looked at cross-sections of the delayed release seeds
3         which enabled us to look at the composition from the surface
4         of the bead to the core.
5    Q    Now, did you consider Dr. Davies' testimony and testing
6         in this case?
7    A    Yes, I did.
8    Q    And you were here when he testified.  Correct?
9    A    Yes, I was.
10   Q    Dr. Sommer, why didn't you repeat Dr. Davies' washing
11        analysis?
12   A    Much of the work that we do in the laboratory is
13        forensic in nature dealing with trace evidence.  And we're
14        taught as good analytical chemists and forensic scientists
15        not too adulterate the samples.
16             I believe Dr. Davies' washing step does just that.
17        In particular, if you look at the components in the delayed
18        release coating, it's highly likely, because of their
19        differential soluabilites, it's highly likely that some
20        materials will be removed and other materials will remain.
21   Q    Now, did you review Dr. Davies' SCM images that he
22        produced in this case?
23   A    Yes, I did.
24   Q    Did you see any evidence in Dr. Davies' SCM images that
25        informed your opinion to the washing step?
```

JOHN KEVIN STONE, CSR

15

```
1    A    Yes, I did.

2              THE COURT:  Counsel, did I understand, I thought

3    you said he was the only one that did the SCM in the case.

4              MR. SCHEFFEL:  Your Honor, he said he was the only

5    one who did SCM EDS analysis.  It's a additional analysis I

6    will briefly step through with Dr. Sommer.

7              THE COURT:  Okay.  I just wanted to be sure I

8    understood.

9              MR. SCHEFFEL:  Thank you.

10   BY MR. SCHEFFEL:

11   Q    Dr. Sommer, could I turn to ITX 194 in your notebook.

12   A    Okay.

13   Q    Do you recognize ITX 194?

14   A    Yes.  This was the production materials from Dr. Davies.

15   Q    Could I ask you to turn to ITX 700 in your notebook.

16             Do you recognize ITX 700?

17   A    Yes, I do.

18             These appear to be the same images from doctor --

19   that were included in Dr. Davies' deposition or his expert

20   report.

21   Q    And the difference being that there are Davies numbers

22   down on the bottom right corner?

23   A    Yes.

24   Q    Can you turn to ITX 194-036.

25   A    Okay.
```

```
 1    Q    Dr. Sommer, do you recognize that image?
 2    A    Yes.  This is one of Dr. Davies images of an unwashed
 3    bead.
 4    Q    And what characteristics of this image are of note?
 5    A    What I'd like to point out is that at the -- at the
 6    delayed release coat or interface, or at the edge of the
 7    actual bead itself, you see that it's very smooth and there
 8    are no defects whatsoever.
 9    Q    Now, can we turn to ITX 194-005.
10    A    Okay.
11    Q    Dr. Sommer, do you recognize that image?
12    A    Yes.  This is the image of a bead that had been exposed
13    to the 20 minute washing.
14    Q    Is it your understanding that this image correspond to
15    SCM 10 from Dr. Davies' report?
16    A    Yes, it does.
17    Q    And that's also referred to as PTX 231?
18    A    Yes.
19              MR. CONDE:  Excuse me, what is that image, 0055?
20              MR. SCHEFFEL:  005.
21              MR. CONDE:  I apologize.  I couldn't hear.  I
22    thought you said 55.
23    BY MR. SCHEFFEL:
24    Q    And, Dr. Sommer, what characteristics of this image are
25    of note to you?
```

1    A    Well, now it's zoomed out.

2              MR. SCHEFFEL:  Eric, can you please go back to ITX

3    194-005.

4    A    So in particular, again, if you focus your attention to

5    the coating or the area where the delayed release coat hits

6    the core all the way around the bead, you can see

7    significant cratering.  So here and all the way through

8    here.

9    Q    Dr. Sommer, is that just an artifact of that particular

10   seed?

11   A    No.  It wouldn't be an artifact of that particular seed

12   because you don't see that throughout the entire seed

13   itself.  You only see it at the edge of the seed.  And more

14   importantly, the defects run parallel with the delayed

15   release coat.

16   Q    And to what do you distribute that to?

17   A    I attribute that to the effect of using the acetone wash

18   in preparation.

19   Q    And do you have additional images in that ITX 194 that

20   highlight this effect?

21   A    Yes, I do.

22   Q    Could you point to 194-004.

23              Do you recognize this image?

24   A    Yes, I do.

25              This is a blow-up of the region of the previous

1    image.

2    Q    And what does this image show to you?

3    A    And, again, here you can see right along the delayed

4    release coating or interface, you can see significant

5    cratering along that interface.

6    Q    Dr. Sommer, did you see similar evidence in any of the

7    SCMs of any of the unwashed beads?

8    A    No.  The unwashed beads, again, they were characteristic

9    for the first image that we showed, where he had a smooth

10   surface at the delayed release coat interface.

11   Q    Did you see any evidence of this cratering in any of the

12   other SCMs of the 10-minute and five minute wash?

13   A    Yes.  There was evidence for the cratering but to a

14   lesser extent.

15              THE COURT:  Look at Exhibit 194.  Isn't there

16   cratering in that exhibit?  And that's prior to being

17   washed.

18              MR. SCHEFFEL:  I'm sorry 194, what page, Your?

19   Honor.

20              THE COURT:  194, the first image on line 4.  Just

21   kind of find it -- would you bring up 194-001.

22              MR. SCHEFFEL:  Make sure we have the right image,

23   Your Honor.  Is this the image you're referring to?

24              THE COURT:  Yes.

25              And to the left of the outer coating, isn't that

```
 1     cratering?
 2              THE WITNESS:  Are you referring to this area up
 3     here, Your Honor?
 4              THE COURT:  Yes.  All those dark spots.  Right.
 5              Isn't that cratering as well?
 6              MR. SCHEFFEL:  That is a washed bead.
 7              THE COURT:  Is that a washed bead?
 8              Okay.
 9              The first one is a washed bead.
10              MR. SCHEFFEL:  Yes.
11              THE COURT:  All right.  Fine.
12              Go ahead.
13     BY MR. SCHEFFEL:
14     Q   Dr. Sommer, I'd now like to turn to the ATR-FTIR
15     imaging, and in particular I'd like you to start with the
16     description of the ATR method that Dr. Davies' utilized.
17              Can you please provide us with a brief description
18     of the ATR-FTIR method used by Dr. Davies?
19     A   Yes.  I have a slide that shows the method.
20              So, in Dr. Davies' method, again, as he said, you
21     point an I-R source into a material of high refractive
22     index, in this case silicon.  The infrared light then
23     slightly penetrates out of the IRE and interacts with the
24     the sample, and then the light that's reflected goes up.
25     And in Dr. Davies case to a single detector.
```

1            When he records the spectrum, he gets a single

2    spectrum over here.  Now, Dr. Davies did this and he

3    recorded a spectrum from a single 50 by 50 micrometer area

4    on the surface of the bead.

5            So what you're looking at is material just on the

6    surface, again, this penetration depth here is only one

7    micron, and the spectrum that he records is a composite or

8    mixture spectrum from that area.

9    Q   And does Dr. Davies have to apply pressure to the

10   interface?

11   A   Yes, he does.  He has to apply pressure in order to

12   maintain intimate contact with the pellet and the actual

13   IRE.

14   Q   Now, let's talk about the ATR and SCM imaging analysis

15   you did in this case.

16   A   Okay.

17   Q   Can you please provide the Court with a brief summary of

18   ATR-FTIR imaging?

19   A   Again, as I note here, we bring an infrared source in,

20   in this case we have a **germane internal reflection element

21   and that gives us a four fold improvement in the spatial

22   resolution that we obtain.  And as you'll note here, we're

23   actually analyzing the cross-section bead so we can

24   interrogate the seed from the surface to the core of the

25   pellet.

 1          And the other big difference is that in this case
 2    we have an array detector, so what we do is we select 16,384
 3    spectra.  Those spectra then are assembled into an image and
 4    we can chemically tune that image to any specific chemical
 5    component we're interested in.  And you note over here we
 6    sampled a 200 by 200 micron area at two different spots,
 7    basically going from the surface of the bead into the core
 8    again.

 9          And if you kind of take a look and look at this as
10    a clock, you know, that each one of these squares will
11    correspond to a number and so you know there are 12 hours in
12    a day, if we divide one by 12, that shows that in this
13    particular case we're sampling about 8 percent of the
14    delayed release coat around the bead.  And if we do two
15    spots, we're up at around 16 percent.
16    Q   Did Dr. Davies do any ATR-FTIR analysis all the way
17    around the bead?
18    A   No, he did not.
19    Q   Dr. Sommer, can you briefly describe for us what the
20    advantages of your method are over Dr. Davies' ATR-FTIR
21    method?
22    A   Yes, I can.  I have several slides.
23          So what we're comparing on this slide is Dr.
24    Davies' method on the left, and our method on the right.
25    And again, if you look at Dr. Davies' method, he recorded a

1    single spectrum over a 50 by 50 micrometer area.  And let's

2    say you have two different components in that area, X and Y.

3    The spectrum that he records is a mixture of those two

4    materials.

5         So the important thing here is that what Dr. Davies

6    would have to do is he'd have to actually go in then and

7    interpret the spectrum.  And in addition, you don't really

8    know where, what the spatial distribution of X and Y is.

9         In our method, because we have such a very small

10   focused spot at the sample, and we collect many many

11   different, or 16,384 spectra, we have the ability to focus

12   in almost on single components.  And so the spectra that we

13   record are going to be nearly pure components for the

14   materials under study.

15        So in this case this is the spectrum of X, which

16   for demonstration purchases is HPMCP, and this is the

17   spectrum of Y, which is the spectrum of talc.

18   Q    And, Dr. Sommer, can I have you now focus on another

19   very important difference between your ATR-FTIR method and

20   Dr. Davies analysis.

21   A    Yes.

22   Q    The depth analysis.

23   A    Yes.  That's shown in the next slide.

24        So here what we're doing is we're comparing the

25   depth analysis between the two methods.  So if you look at

1    -- we have four columns here.  We have the seed or the type

2    of seed; we have the delayed release coating thickness, the

3    percent of the sample that was actually sampled, and the

4    percent of sample that was actually unexplored.

5         And so if you look at Davies' unwashed seed, he

6    said that the delayed release coating was approximately 14

7    microns thick.  He also said that the beam penetrates the

8    sample to a depth of about one micron.  So this dark region

9    here is his sampling area.

10        And then if you look over here, basically, he's has

11   93 percent of the sample that he's unexplored.  So he can't

12   tell what the composition is down in this region.

13        If you go to the washed seed, again, he mentioned

14   that the remaining material was about four to six microns in

15   thickness, so we have a sampling depth of again, one micron.

16   And over here that corresponds to less than 25 percent of

17   the delayed release coating that was actually sampled.  75

18   percent of that was unexplored.

19        Now, because we looked at cross-sections, okay,

20   again, we're able to go from the surface of the seed all the

21   way into the core.  And because of our area, okay, we

22   sampled a hundred percent of that area, again from the

23   surface of the seed to the core, and the amount of material

24   or area that was unexplored is zero.

25   Q   And just to be clear, we're talking about the depth from

1    the surface all the way to the core.  Right?

2    A    Yes.

3    Q    So does Dr. Davies know anything about the area right at

4    the core interface chemically?

5    A    No, he does not.  There's no way with his sampling

6    method he could have looked at that.

7    Q    Now, earlier you said you were a co-developer of this

8    technique.  Right?

9    A    Yes, I did.

10   Q    And you understand its advantages and limitations?

11   A    Yes, I do.

12   Q    Based on your, I think you said 17 years worth of

13   experience with this technique, do you think it has

14   appropriate resolution to analyze the Impax delayed release

15   seeds?

16   A    Yes, I do.

17   Q    Dr. Sommer, is your ATR-FTIR imaging technique accepted

18   by others in the field?

19   A    Yes, it's a relatively new technique, but it's widely

20   accepted in the analytical science.

21   Q    Do people come to you to learn about ATR-FTIR imaging?

22   A    Yes.  We've had many people to come to us to learn about

23   the method and apply it in different situations including

24   Los Alamos National Laboratories.

25   Q    Turning a little bit to your sample preparation and your

```
 1     analysis now.

 2           Dr. Sommer, did you receive samples from Impax for

 3     analysis?

 4     A    Yes, I do -- yes, I did.

 5     Q    How did you isolate the delayed release seeds.

 6     A    We removed the seeds from the sealed bottle, we pulled

 7     out several of the tablets, and we gently crushed them in a

 8     bar pestil and what that did was to release the seeds from

 9     the actual tablet itself.  We further isolated the seeds

10     with a fine pointed probe and a tweezers under

11     stereomicroscope observation.

12     Q    And after you isolated the delayed release seeds, what

13     did you do?

14     A    What we did is we took those seeds over to the Center

15     for Advanced Microscopy and Imaging at Miami University and

16     we had them cross-sectioned under my supervision.

17     Q    Why did you take the seeds there?

18     A    Folks over at the center have wide experience in

19     cross-sectioning a wide variety of different materials.

20     Q    And you have a lot of experience with that lab?

21     A    Yes, I do.  That's where we do, actually do all of our

22     high end sectioning.

23     Q    And what is your level of confidence in the

24     cross-sections that were prepared for analysis in this case?

25     A    Again, many of the people over there have significant
```

1    years of experience, in particular Matt Gooley, who did the

2    sectioning for us, has close to 15 years of experience, and

3    so I have a very high degree of confidence with those

4    people.

5    Q    Dr. Sommer, do you have experience in analyzing layers

6    of various materials?

7    A    Yes, I do.

8         As a graduate student we looked at corrosion of car

9    bodies, so there we were looking at the corrosion between

10   the steel substrate and organic overcoat.  So we were very

11   interested in the interface.  With our work in determining

12   disease states, we look at very small particles and layers

13   in cells and also our work with Kodak, we're looking at

14   photographic film where the layers are very, very thin.  So

15   we have extensive experience in these types of samples.

16   Q    And this isn't the first time that you've looked at

17   pharmaceutical tablets.  Right?

18   A    No, it is not.

19   Q    Is this the first time you've looked at cross-sections

20   of pharmaceutical tablets in order to identify the sub

21   layers?

22   A    It's the first time we tried to or looked at

23   pharmaceutical tablets to try to identify sub layers.  But

24   all of our other experience is applicable to this problem.

25   Q    Now, was there anything special about the dosage form in

```
 1    this case that posed any special challenges in your opinion?
 2    A    No.
 3    Q    And once the samples were prepared, what did you do?
 4    A    Once the samples were prepared, we did ATR-FTIR imaging,
 5    I believe it was on five pellets, at two different spots,
 6    and then we corroborated that data with scanning electron
 7    microscopy, inter-energy dispersal of microspectroscopic
 8    imaging, and we did that on three individual pellets.
 9    Q    I think you testified earlier you also conducted SCM EDS
10    analysis.  Is that right?
11    A    Oh, can you repeat the question, Robert.
12    Q    I think you testified you also conducted SCM EDS
13    analysis.  Is that correct?
14    A    Yes, I did.
15    Q    How many seeds did you analyze?
16    A    The SCM EDS analysis, we looked, I think it was at one
17    seed, but the SCM EDS imaging analysis we did on three
18    sides.
19    Q    Dr. Sommer, in conjunction with that analysis, what
20    chemical entities did you focus on?
21    A    Because Dr. Davies contends that there is HPMCP derived
22    material enriched in talc between the delayed release
23    coating and the core, we focused our attention on HPMCP and
24    talc.
25    Q    And did you include the images that you generated in
```

```
 1    this case in your expert report?

 2    A    Yes, I did.

 3    Q    Could I point you to ITX 441 in your notebook, please.

 4    A    Okay.

 5    Q    You recognize ITX 441?

 6    A    Yes, I do.

 7              This is a compilation of the optical and ATR-FTIR

 8    imaging results.

 9    Q    And did you also provide all the underlying data you

10    compiled from your analyses?

11    A    Yes, I did.

12    Q    And did this include all of the thousands of I-R spectra

13    that you generated in conjunction with your analysis?

14    A    Yes.

15    Q    You have -- you selected samples of images that you've

16    created through your analysis to present to the Court today?

17    A    Yes, I did.

18    Q    I believe this is pellet three in the first location.

19              Dr. Sommer, can you briefly explain to the Court

20    what these images represent?

21    A    Yes.

22              What these are are ATR-FTIR images of the seeds and

23    as you'll note in both of these images, we're going from the

24    delayed release coating, which is depicted here -- I'm

25    waiting for the Judge to find --
```

1              THE COURT:  I have it.  Thank you.

2       A    Okay.  The delayed release coating which is here, and

3       over here (indicating), and this is the core, and in the

4       left hand image we have chemically tuned that image to HPMCP

5       using the 1722 infrared peak for that material.

6       Q    And how are the colors assigned on these images?

7       A    The colors are assigned by the computer in the software

8       that's supplied with the instrument.

9       Q    And what spectral resolution is this image taken at?

10      A    We collected our images at four wave number spectral

11      resolution, and the significance of that is that we can

12      differentiate two chemically very similar materials using

13      that resolution.

14      Q    Were all of your images taken with four wave number

15      resolution?

16      A    We took some with four wave number resolution to get

17      better definition, and others we took with eight wave

18      resolution.  But either one doesn't really make a

19      difference.

20      Q    Now, let's go to the image on the right back on 431-10.

21              Dr. Sommer, what does this image depict?

22      A    So what this image is depicting is the image where we

23      tuned to a specific or characteristic absorption or infrared

24      peak for talc.  And so what you're looking at here, again,

25      we have the core over here.  Here we have the delayed

1    release coating, and you can visualize the talc as the red

2    yellow spots in that delayed release coating.

3    Q    And what does that image show to you as an expert?

4    A    As an expert it shows me that the talc is randomly

5    distributed throughout the delayed release coating.

6    Q    Dr. Sommer, how do you know that those red and yellow

7    spots are talc?

8    A    Well, part of the image is the fact that we have 16,384

9    spectra, and I can go in with my computer and pull out a

10   single spectrum at a specific locations.

11              MR. CONDE:  Objection, Your Honor.

12              None of these spectrum were provided to us during

13   discovery.  He's talking about spectrum he can go pull out,

14   but none of them were provided to us during discovery, and I

15   think he testified as much during the deposition.

16              THE COURT:  Are you talking about -- that's a

17   blow-up of 431-10.  Right?

18              MR. SCHEFFEL:  That's correct.

19              THE COURT:  All right.

20              And these were not provided to you?

21              MR. CONDE:  What wasn't provided was the spectrum

22   he just referred to, he can pull out spectrum from his

23   computer.  But we never got those spectrum.  That's my

24   point.

25              THE COURT:  All right.

```
 1              Go ahead, counsel.
 2              MR. SCHEFFEL:  Well, that is incorrect, Your Honor.
 3    We provided all of the data files that have all the
 4    individual spectrum that he collected, all 16,000 of those,
 5    and all you have to do is open them up and you can pick on
 6    each one and the spectrum is there.  So they did have that
 7    information from the beginning, at the outset.
 8              THE COURT:  All right.
 9              The objection is overruled.
10              Go ahead.
11    BY MR. SCHEFFEL:
12    Q    Dr. Sommer, do you have a slide to help explain the talc
13    specificity?
14    A    Yes, I do.
15              So again, you know, I have 16,384 spectra, and what
16    I can do is that's what's made the image up, and I can go to
17    a specific spot and pull the spectrum out and then I can
18    interpret it.
19              So if we look at the red area, okay, I can pull a
20    spectrum out there and the spectrum is color-coded to the
21    color code of the image, and what you're seeing here is the
22    infrared spectrum of talc.  You can see the band at 1008 and
23    you can also see the band that Dr. Davies identified up here
24    about 3700 wave numbers as well.
25              If I go to the green areas in the delayed release
```

```
 1    coating, again, I can pull a spectrum out, and again, what

 2    you notice here is that in this particular case we again

 3    have talc.  And we're also starting to see a little bit of

 4    HPMCP which is down here at 1317-22.

 5            Likewise, if I go to the aqua areas you can see the

 6    spectrum there, and again you note the feature at 1008,

 7    which is characteristic for talc, and again a little more

 8    HPMCP.

 9    Q    Dr. Sommer, why did you pick the 1008 peak for talc?

10    A    The 1008 peak for talc is very characteristic for that

11    material and it's also a very strongly absorbing peak.

12    Q    Now, you heard Dr. Davies criticize you for picking this

13    peak because in his opinion the talc band overlaps the

14    HPMCP?  Is that correct?

15    A    That is correct.

16    A    Do you agree with Dr. Davies?

17    A    No, I do not.

18    Q    Why not?

19    A    I have a slide that shows that.

20            MR. SCHEFFEL:  Slide eight, please.

21    BY MR. SCHEFFEL:

22    Q    Can you briefly explain to the Court what this slide is?

23    A    So, this slide is our spectra that we provided during my

24    expert report, you can sigh the source down here.

25    Q    Those sources, just for the ITX, are 402 and ITX 403?
```

1    A    Okay.

2    Q    And what you're seeing is the blue spectrum is the HPMCP

3    and the black spectra is the talc.  So here you see the 1008

4    wave number band, and then if you look at the HPMCP, you

5    have a band at 1063 here, and a band at 947.  So, roughly,

6    we've got a 40 wave number difference here, and roughly a 50

7    wave difference number here.

8         So now our spectral resolution are -- was four wave

9    numbers and, you know, these bands are this far apart.

10   (Indicating).  So we can easily distinguish those bands

11   based on spectral resolution.

12        More importantly, if you look at the absorption

13   strength of talc, in this -- these plots, we've plotted

14   these on scale, and the spectra were recorded under

15   identical conditions.  And so what you see is that the talc

16   is significantly more absorbing, or in this case it's 7.35

17   times more absorbing.  So when you looked at delayed release

18   coating you're really looking at talc because of the

19   intensity.

20   Q    So based on your experience, this 1008 wave number peak

21   that you picked, is that specific for talc?

22   A    That is specific for talc.

23        So both of the -- both of these facts that we have

24   enough spectral resolution and the intensity differences,

25   both of those facts say that yes, the images that we're

1    seeing are definitely talc.

2    Q    Now, Dr. Sommer, you also heard Dr. Davies criticize the

3    spatial resolution of your method.  Is that right?

4    A    Yes, I did.

5    Q    Do you agree with that criticism?

6    A    No, I do not.

7    Q    Dr. Sommer, what is the spatial resolution of your

8    ATR-FTIR imaging method?

9    A    The spatial resolution of the method is one half the

10   wavelength of light that you're using for analysis.

11         So, for example, at the 1722 wave number position

12   for HPMCP, the wavelength is 5.8 micrometers, and if you

13   take up half of that, we wind up with something slightly

14   less than three micrometers.

15         If you look at the 1008 wave number feature for

16   talc, the wavelength for that is 9.9 micrometers, and if you

17   take half of that wavelength, it's slightly less than five

18   micrometers.

19   Q    I'll have you turn to, in your notebook, to PTX 250,

20   please.

21   A    Is that PTX 250?

22   Q    PTX 250.  Correct.

23   A    It's in the back.  Okay.

24   Q    Do you recognize that document?

25   A    Yes.

```
 1                This is a technical note that Perkin Elmer
 2       Corporation, the folks that co-developed the method with us,
 3       published on the spatial resolution of the ATR-FTIR imaging
 4       approach, and in these technical notes verifies
 5       experimentally the spatial resolution that we're contending.
 6       Q    Dr. Sommer, did your method have sufficient resolution
 7       to analyze and determine whether there is as intermediate
 8       layer as Dr. Davies suggests?
 9       A    Yes.  And I believe I have a demonstrative for that.
10       Q    Slide to help explain?
11       A    Yeah.
12                MR. SCHEFFEL:  Can you please.
13       A    So again, what you're seeing here is a blow-up of the
14       region from pellet three.  Here we have a delayed release
15       coating from here to here, and what I've done is again,
16       using the software provided with the instrument, I drew a
17       line, and that line has a distance of 20 micrometers.  And
18       so you can see these three entities here as separate
19       entities, and if you envision, I can put another one over
20       here, and I can put another one over here, so I basically
21       have a 20 micrometer distance divided by five.  So I I have
22       spatial resolution of four micrometers.
23       Q    And were you here when Dr. Davies testified as what he
24       said is a stabilizing layer, a single layer?
25       A    Yes, I did, or yes, I was.
```

1    Q   Does your technique on the spatial resolution detect a

2    single layer of between four and six microns?

3    A   So if there were two layers there, and they were

4    separated by five microns, I would be able to distinguish

5    those two layers.  If there's a single layer present, and I

6    only needed to detect that single layer, I could detect that

7    single layer, even if it was less than one micron thick.

8    Again, because talc is very, very strong infrared absorbent.

9    Q   Dr. Sommer, did you see any evidence of a layer as Dr.

10   Davies suggests in your analysis?

11   A   No, I did not.  Not in the context that he used where it

12   was talc enriched HPMCP modified.

13   Q   Now, can we move to HPMCP, can we go back to 436-10,

14   like to focus on the image on the left.

15           Dr. Sommer, what does that image show?

16   A   Again, this is an image that has been tuned specifically

17   for HPMCP using the 1722 infrared peak.  And again, what

18   you're looking at here is the core, and over here the red

19   and yellow areas are areas where the HPMCP is high in

20   concentration and the green areas are where HPMCP is

21   relatively low in concentration.

22   Q   Did you sey HPMC?

23   A   HPMCP, right.

24   Q   Sorry.

25           Now, what are the green bands?

1    A    Okay.

2    Q    Do you see those?

3    A    So you see this green band here, and you'll note there's

4    also a green band over here.  And these regions are where

5    the HPMCP, sorry, John, is beginning to mix with the core,

6    and then likewise out here, this is where HPMCP is beginning

7    to mix with the area, because again we're looking a very

8    sharp interface.

9    Q    Are those green bands any evidence of an enrichment?

10   A    No, they are not.

11   Q    Dr. Sommer, if their HPMCP material is chemically

12   different from HPMC, would your ATR-FTIR imaging method

13   detect it?

14   A    No, it did not.

15   Q    I said, could it defect?

16   A    Oh, I'm sorry.  Could it detect it?  Yes, it could.

17            THE COURT:  What does the yellow represent, Doctor?

18            THE WITNESS:  The yellow is areas where the HPMCP

19   has a reduced concentration, so it, again, the HPMCP is

20   highest in concentration, you can see the orb bends over

21   here, yellow, lower in concentration, and then green, still

22   lower in concentration.

23            THE COURT:  Okay.  Thank you.

24   BY MR. SCHEFFEL:

25   Q    Now, Dr. Sommer, just to follow-up on that.

1              If there were a HPMCP derived material, what would
2    you expect to see in your analysis?
3    A    If there were a HPMCP derived material I would expect to
4    see an additional infrared peaks in the spectra, or I would
5    expect to see a slight shift in the existing peaks, and Dr.
6    Davies in his data has shown neither.
7    Q    And just to be clear, did you see any evidence of that
8    HPMCP derivative in your analysis?
9    A    No, I did not.
10   Q    Now, did you see any evidence of band shifts in Dr.
11   Davies I-R data?
12   A    Yes.  In Dr. Davies data we noticed a downshift of about
13   three wave numbers and through computer modeling --
14            MR. CONDE:  Your Honor, none of this, he mentions
15   the band shift in his expert report, but it doesn't mention
16   the computer modeling that he's about to talk about in his
17   expert report.  He doesn't identify the band shift, doesn't
18   say how big the band shift is, none of this was in his
19   expert report.
20            MR. SCHEFFEL:  Your Honor, it was discussed in his
21   expert report, and it was gone into in extensive detail in
22   his deposition as well.
23            MR. CONDE:  Your Honor, I'd be happy to show you
24   the paragraph where it's in his expert report, referred to
25   it.  It doesn't go into any detail.

1                THE COURT:  I'm going to allow it.

2                Go ahead.  Overruled.

3      A    So the band shift that we noticed, again, the band for

4      HPMCP I believe in Dr. Davies data showed up at around 1725.

5      And there was a three wave number shift down.

6                And so what we did is we took our reference spectra

7      and we did computer modeling and we showed that even with 5

8      percent by weight acetone in that material, or in that

9      mixture, the band shifted down to almost where Dr. Davies

10     observed the band in his data.  And so what that indicated

11     to us, it was strong evidence that there was still acetone

12     remaining in the coating when he actually did this analysis.

13     Q    Now, what did Dr. Davies say about this band shift?

14     A    In Dr. Davies data he identified that specific band

15     shift as just HPMC or HPMCP.

16     Q    So either way, through testimony or Dr. Davies' data, is

17     there any evidence of a HPMCP derived material?

18     A    No, there is not.

19     Q    Dr. Sommer, I'd just like too quickly step through some

20     of the additional witnesses in 441, just to show the

21     representative work you did.  I don't want, for all the

22     Court's time and everyone else, belabor these, but can you

23     -- can I have you turn to 431.  And this is pellet three,

24     location two?

25     A    Yes.

1    Q   Dr. Sommer, are these images consistent with your prior

2        opinions concerning the presence and location of talc and

3        HPMCP?

4    A   Yes, they are.

5    Q   Can I have you turn to 431-003.  And this is pellet one

6        in the first location.  And this is I believe an eight wave

7        number image?

8    A   Yes.

9    Q   Are those images consistent with your prior opinions

10       concerning the presence and location of talc and HPMCP?

11   A   Yes, it is.

12   Q   Can we go to 431-005.  And this is pellet one in the

13       second location.

14           Dr. Sommer, are these images consistent with your

15       prior opinions concerning the presence and location of talc

16       and HPMCP?

17   A   Yes, they are.

18   Q   I'm going to have you go to 431-01.  This is pellet five

19       at the first location at four wave numbers.

20           Dr. Sommer is this -- are these images consistent

21       with your prior opinions concerning the presence and

22       location of talc and HPMCP?

23   A   Yes, they are.

24   Q   And just to go to one more, I'd like to go to 431-015.

25       And this is pellet five at the second location?

1    A    That is correct.

2    Q    Dr. Sommer, what is this set of images?

3    A    This, again, is -- these are the images for HPMCP and

4    talc.

5    Q    Dr. Sommer, why does the coating in these images appear

6    so much larger than the other images?

7    A    Again, as I noted earlier in the description of the

8    method, we have to apply a little bit of pressure to the

9    sample to get intimate contact, and in this particular case

10   we applied a little bit too much pressure, and so the

11   coating being 20 microns in width, it flattened itself out

12   to about 50 microns in width.

13   Q    And why did you include this image in your report?

14   A    I included it to -- for completeness of the record.

15   Q    Does this image change your overall opinion?

16   A    No, it does not.

17   Q    I'd briefly like to focus a little bit on Dr. Davies'

18   I-R spectra.

19        MR. SCHEFFEL:  Can you pull up ITX 221.

20   BY MR. SCHEFFEL:

21   Q    Do you recognize that exhibit?

22   A    Yes, I do.

23   Q    Now, you were here when Dr. Davies testified that in his

24   opinion the I-R spectra here were chemically different.

25   Right?

1   A   That is correct.

2   Q   Do you agree?

3   A   No, I do not.

4   Q   Why not?

5   A   Again, Dr. Davies himself identifies this particular

6       peak as HP 50.  And if you do a close analysis of the

7       spectra, there are no additional features, and we didn't

8       notice any band shifting other than what we mentioned

9       earlier.

10  Q   So in your opinion, do these I-R spectra reflect a

11      chemical difference?

12  A   No, they do not.

13  Q   Dr. Sommer, I'd like to turn now to the SCM EDS testing

14      that you conducted and you were here when Dr. Davies

15      discussed this analysis.  Right?

16  A   Yes, I was.

17  Q   And he said that your data was not substantially

18      different from what he found in the SCM images.  Right?

19  A   That is correct.

20  Q   Do you agree with that?

21  A   No, I do not.

22  Q   Why not?

23  A   Because our SCM EDS analysis differs significantly in

24      two different ways.

25          We took the extra step of doing the energy

1    dispersive spectroscopic imaging which identifies or can

2    look at an individual element in talc, and in addition to

3    that, we were able to identify the exact spatial location

4    for those talc particles.

5    Q    Did Dr. Davies conduct any EDS analysis?

6    A    No, he did not.

7    Q    Did you hear any reason why he did not conduct such

8    analysis?

9    A    No, I did not.

10   Q    And can you briefly describe for the Court what an EDS

11   analysis is?

12   A    Okay.

13          In EDS analysis or Energy Dispersive Spectroscopy,

14   what you do is you bombard the sample with electrons, and

15   the result of those electrons are that an electron from the

16   sample in question is emitted from the core of the -- the

17   core of the atom itself.  And that electron is very

18   characteristic for the element that you're looking at.

19          So, for example, we can differentiate between

20   silicon and we can differentiate between magnesium.  So the

21   power of that method's very similar to infrared.  In

22   infrared we can -- we collect spectra, and those spectra are

23   unique fingerprints for the molecule.  In energy dispersive

24   spectroscopy the spectra that we collect is a very unique

25   fingerprint for that particular atom.  Again, like infrared,

1    we collect thousands of spectra over a broad area, and then

2    we can re-assemble those spectra into atomic specific or

3    element specific image.

4    Q    Okay.

5         Why did you opt to do that type of analysis?

6    A    Again, that type of analysis, EDS, gives us a little bit

7    better differentiation.  EDS spectroscopic imaging gave us

8    another method to look at also to corroborate our ATR-FTIR

9    imaging results.

10   Q    Did you look at the cross-sections of the beads in

11   conjunction with this analysis?  Correct?

12   A    Yes, I did.

13   Q    Now, can I have you turn in your notebook to ITX 643,

14   please.

15        Do you recognize ITX 643?

16   A    Yes.  This is a compilation of the SCM EDS analysis data

17   that I did.

18   Q    Dr. Sommer, can you briefly describe what is shown up

19   here in ITX 643-3?

20   A    Okay.  This is -- what you see up here in the left hand

21   corner is a back-scattered image of the actual sample.  And

22   then, if you -- if you go back to the full view, what we've

23   done over here is we have mapped the same image for

24   magnesium, the same image for silicon, and for chlorine, and

25   if you look at the magnesium image, we've colored the

1    locations where magnesium is present in blue.

2    Q    Why did you pick magnesium?

3    A    Again, magnesium is one of the elements that's present

4    in talc.  Likewise, silicon is present in talc.

5    Q    So the images on the right side of this figure represent

6    the distribution of talc?

7    A    Yes.  Well, the distribution of magnesium from which you

8    can get the distribution of talc.

9    Q    A representative.  Is that correct?

10   A    Yes.

11   Q    And, Dr. Sommer, if I can have you go back to the

12   back-scattered image.

13         Can you point to us where the delayed release layer

14   is?

15   A    Yes.  The delayed release is right along here.  Okay.

16   So you can see the interface here with the core.  And the

17   delayed release layer kind of ends there and then you can

18   see individual talc particles over here.

19   Q    And where is the core?

20   A    The core material is down -- all down here.

21   Q    Now, Dr. Davies criticized your images because of the

22   upper right corner up there.  Right?

23   A    That is correct.

24   Q    What is that area in the upper right corner?

25   A    The upper right corner is where you have, because of the

```
 1        topology of the actual seed itself, that could be where you
 2        have a dimple or where the bead actually rolls off, kind of
 3        like an over the horizon view.  However, I would like to
 4        note that in many of Dr. Davies SCM images you see the same
 5        effect.
 6   Q    If I can have you turn to ITX 643-009, please.
 7             And what are these images?
 8   A    Again, these are the back-scattered images for the
 9        sample.  You're looking at the magnesium map and the silicon
10        map and the chlorine map, and what's really neat about these
11        images are that you can actually see the delayed release
12        coating here.  Okay.
13             I have much better detail now.  So you can see the
14        delayed release coating which is right here and here.  And
15        you can see the actual individual talc particles now.  And
16        if I do my elemental imaging, you know, we can go back and
17        look at the magnesium image.
18             Okay.  What I've done in this case is I've overlaid
19        the elemental map with the back-scattered image and now you
20        can see the individual talc particles highlighted in blue.
21   Q    And what do you conclude from that image with respect to
22        talc?
23   A    Again, from this image, with respect to talc, the talc
24        is randomly distributed throughout the delayed release
25        coating.
```

```
 1    Q    Now, if you -- if we go back to the full view of this
 2         page, focus your attention down at the bottom of that.  I
 3         believe you were here when Dr. Davies criticized these
 4         images because of the pink region up in the middle of the
 5         page on the right?
 6    A    That is correct.
 7    Q    What is that?
 8    A    That is a chlorine containing material.
 9    Q    Is that typically present in the outer coating?
10    A    No, it is not.
11    Q    Did you see this in any of the other SCM EDS analysis?
12    A    No, I did not.
13    Q    Does this in any way effect your opinions?
14    A    No, it does not.
15    Q    Now, you were also here where Dr. Davies criticized your
16         EDS analysis because he said your sampling depth is up to
17         five microns.  You remember that?
18    A    Yes, I do.
19    Q    Do you agree with that?
20    A    No, I do not.
21    Q    Why not?
22    A    That is a misleading statement.
23         What Dr. Davies was considering was that he was
24    looking at the penetration depth or the depth at which the
25    electrons go for HPMCP.  The images that we generated for
```

```
 1    magnesium, the electrons come specifically from magnesium,
 2    nothing else.  They don't come from HPMCP, they don't come
 3    from magnesium or silicon.  And if you calculate the
 4    penetration, that number comes out to be 2.1 microns.
 5    Q   And just to sum up, Dr. Sommer, can you please provide
 6    the Court with an overall summary of your opinions based on
 7    your analysis in this case?
 8    A   Yes.
 9        Based on my analysis using ATR-FTIR imaging and
10    energy dispersive spectroscopic imaging, I found that the
11    talc in the delayed release coating was randomly
12    distributed.  Further, I see no evidence for an HPMCP
13    derived material enriched in talc located between the
14    delayed release coating and the core.
15    Q   And do you have any conclusion as to whether the Impax
16    seeds contain a stablizing coat and the core and the delayed
17    release coating?
18    A   Yes.  The Impax seeds do not contain a stablizing coat
19    between the delayed release coat and the core.
20    Q   Thank you.
21    A   Thank you.
22            THE COURT:  All right.
23            Thank you, Mr. Scheffel.
24    CROSS-EXAMINATION
25    BY MR. CONDE:
```

1    Q    Good morning, Dr. Sommer.

2    A    Good morning.

3    Q    Let's discuss your experience briefly again, just so

4    that we're clear.

5              I think you testified this morning that you've only

6    offered two papers regarding pharmaceutical preparations.

7    Right?

8    A    That is correct.

9    Q    And both of those were looking at the core materials,

10   not at a layer.  Right?

11   A    That is correct.

12             But through my extensive experience with other

13   materials, again, I cited those in my testimony today.

14   Q    And you're not an expert regarding coatings used in

15   pharmaceutical formulations, are you?

16   A    I'm an expert in coatings and organic coatings in

17   general, used for coatings on car bodies, coatings on

18   polymer films, so I view myself as an expert in those areas.

19   Q    Turn to your deposition, sir, page 73.

20   A    Yes.  Okay.

21   Q    Were you asked the question, "are you an expert on

22   coatings used in pharmaceutical formulations?

23             "Answer:  I'm not an expert in coatings used in

24   pharmaceutical formulations but I can be considered a expert

25   on coatings."

1          Were you asked that question and did you give that

2     answer?

3          MR. SCHEFFEL:  Objection, Your Honor.  That's not a

4     question --

5          THE COURT:  Is there any significant difference  in

6     analyzing pharmaceutical coatings and analyzing some other

7     sample for coatings?

8          THE WITNESS:  No, there is not.

9          THE COURT:  Okay.

10    BY MR. CONDE:

11    Q   Well, some of the things you do analyze are paints.

12    Right?

13    A   Yes.

14    Q   And they contain organic coatings very similar to HPMCP,

15    and you wouldn't swallow paint though.  Right?

16         THE COURT:  Oh, come on, Mr. Conde.

17         MR. CONDE:  Well, I think there's a difference --

18         THE COURT:  You can think there's a difference, but

19    I didn't hear there's a difference.  I mean if you apply the

20    same kind of analysis and you put the sample under the same

21    kind of testing, if it's there, it's there, I would assume.

22    Is that correct?

23         THE WITNESS:  Yes, that's correct.

24    BY MR. CONDE:

25    Q   Are you an expert in institute coat formulations,

1          Doctor?

2          A    No, I am not.

3          Q    And you --

4                    THE COURT:   Do we have any expert in institute

5          formulatons?

6                    MR. CONDE:   Dr. Davies is.  He testified in his

7          other previous cases --

8                    THE COURT:   But he didn't know how in this case an

9          NC 2 layer may have formed.  Did he offer any testimony

10         about that?

11                   MR. CONDE:   No, he didn't, Your Honor.

12                   THE COURT:   Okay.

13         BY MR. CONDE:

14         Q    And with regard to your technique, you thought it was

15         appropriate to apply under this circumstance even though as

16         far as you knew no one else had applied your technique to

17         pharmaceutical preparations.  Right?

18         A    Again, when we applied the technique we had experience

19         with other materials and samples that had a similar

20         structure.

21         Q    Let's talk about your SCM data.  I just want to make it

22         clear.

23                   You did not do any SCM data on washed beads.

24         Right?

25         A    No, I did not do any SCM data on washed beads.

1    Q    Okay.

2              So, could you please turn to your exhibit book

3    first and go to ITX 194.

4    Q    And at ITX 194 are a series of images from Dr. Davies

5    work.  Correct?

6    A    That is correct.

7    Q    Okay.

8              So they're not identified on it, the identity of

9    the pellet or the sample is not provided anywhere on any of

10   these images.  Right?

11   A    Yes, I believe so.

12   Q    You believe -- you believe that there's no

13   identification of a precise pellets on any of these pages?

14   A    Yes, I do, or I believe that there's no identification.

15   Q    There's no identification?

16   A    Yes.

17   Q    So from looking at this set of images, it doesn't

18   identify whether any of them are washed or unwashed, does

19   it?

20   A    No, it does not.

21   Q    So if you could turn to 194 015.  From looking at the

22   image you wouldn't know whether it's washed or unwashed.

23   Right, Dr. Sommer?

24   A    It's a relatively low magnification, but just looking at

25   the characteristics of the bead I believe that this specific

```
 1    bead, the 194 015 is an unwashed bead.

 2    Q    Now -- but you would want to confirm that based on an

 3    index that was given to you.  Right?

 4    A    Well, what I was -- what I would want to do is I would

 5    want to look closer at the delayed release coating core

 6    interface.

 7    Q    Well, how about the image before that, which is 014.  Do

 8    you know if that's washed or unwashed?

 9    A    Again, this is a small section now, so we'd have to go

10    to something intermediate to look to see whether it was

11    washed or unwashed.  Now, looking up --

12    Q    Well --

13    A    -- looking up -- looking up in the upper left hand

14    corner, it does appear that this is a washed bead.

15    Q    Okay.

16         Because in the left hand corner you see cratering?

17    A    I see cratering.

18    Q    All right.

19         And of course this is a two micron image, right?

20    Two microns is the size of the image?

21    A    That's the scale at the bottom, yes.

22    Q    And I think you went to 194 004 and that's a two micron

23    scale as well.  Right?

24    A    Excuse me, which image are you talking about?

25    Q    004.
```

```
 1    A    194 00 -- 4.  Yes.  That's a two micron scale.

 2    Q    Okay.

 3          So you believe that one, that 014, is a washed

 4    bead.  Right?

 5    A    Yes.  In the 194 004 that shows significant cratering,

 6    and so that's again the 20 minute washed bead.  If I go back

 7    to what bead was it now?

 8    Q    014.

 9    A    014.  Okay.  Because there's only one section in this

10    particular bead I would say, you know, that this would be a

11    five minute wash.

12    Q    Okay.

13    A    If --

14    Q    Okay.

15          So go back -- go to, in your book, ITX 700, and

16    leave open the image from 014 and go to ITX 700 and turn to

17    page 20267.

18    A    Oh, ITX 700 to what?

19    Q    20267.

20    A    20267.

21          THE COURT:  What book are you talking about?

22          MR. CONDE:  In his book, it's ITX 700.

23          THE COURT:  Right.

24          700.  And then which?

25          MR. CONDE:  Page 20267 of 7.
```

```
 1    A    20267.

 2    Q    Is the image at 20267 a washed or an unwashed bead?

 3    A    Again, it appears in the upper left hand corner you have

 4    cratering in that region.

 5    Q    Now, go to ITX 669.

 6              You have ITX 669?

 7    A    I'm getting there.  Six -- 669 or 699?

 8    Q    I'm sorry, 699.  Thank you.

 9              And you know what this is, right, Dr. Sommer?  It's

10    an index that was provided for all of the Davies production

11    numbers identifying whether the beads were washed or

12    unwashed.  Right?

13    A    That is correct.

14    Q    So let's look at page in the index, on the first page

15    20267.  You see that?

16    A    That is correct.

17    Q    And it says it was an unwashed bead.  Right?

18    A    That's correct.

19    Q    So there were, the unwashed beads have craters as well.

20    Right?

21    A    Does 20267 correspond to the image that we just looked

22    at?

23    Q    Yes, it does.

24    A    So can you direct me to that image?

25    Q    It's right in ITX 700.
```

1    A    Yes, that is correct.

2    Q    Now, Dr. Sommer, you agree that HPMCP is soluable in

3    acetone and water.  Right?

4    A    What do you mean by "soluable"?

5    Q    Do you agree that HPMC 50 is soluable in acetone and

6    water?

7    A    Well, I don't recall the conditions that were shown in

8    Court this week regarding --

9    Q    Okay.

10        Would you turn to your transcript, page 280,

11   please.  And start at line 9, and were you asked this

12   question and did you give this answer.

13        "Question:  What is your knowledge of the

14   solubility of HPMCP in a mixture of acetone and water?"

15   There was an objection, and then you give an answer, but I'm

16   going to skip to about line 20, where you say "ethyl or

17   triethyl citrate is an ester just like HPMCP.  So both

18   materials should be soluable in acetone."

19        Were you asked that question and did you give that

20   answer, sir?

21   A    Yes, I gave that answer, but later on I questioned, you

22   know, there's a degree of solubility.  So for HPMCP and TEC,

23   sure, they might be soluable, but the question is to what

24   extent.  There has to be some quantitative information

25   provided.

```
1    Q    You didn't include any of that in your response in the
2    answer at the deposition, did you, sir?
3    A    I believe I did.
4    Q    And you don't have any specific knowledge of what is
5    required to remove HP 50 and talc coatings from
6    pharmaceutical products, do you?
7    A    No, I do not.
8    Q    And I think what you said is that at one point you said
9    that Professor Davies did not wash the beads long enough.
10   Do you recall that, Dr. Sommer, there in your expert report
11   or deposition?
12   A    Can you show me specifically where?
13   Q    Sure.
14        Go to page 286.
15   A    Okay.
16   Q    And on page 286 were you asked the following question
17   and did you give the following answer.
18        "Question:  If the thickness of the remaining layer
19   does not change in a 10-minute wash versus a 20 minute wash,
20   what does that say to you?
21        "That says, -- Answer:  That says to me there is a
22   point at which HPMCP solubility, because of -- there is just
23   not enough time to actually do the dissolution."
24        Do you see that, sir?
25   A    Again, this is on page 286?
```

```
 1   Q   Yes, sir.  Yes.

 2       You see that question and answer?

 3   A   And you're talking about line 23?

 4   Q   No, I'm at line 3 to line 11.

 5   A   Okay.

 6       That is correct.

 7   Q   You didn't make any attempt to wash Impax's beads with

 8   acetone and water longer than 20 minutes, did you, sir?

 9   A   No, I did not.  Because I feel that the acetone water

10   wash contaminates and adulterates the seeds and in my

11   analysis it wasn't required.

12   Q   Okay.

13       So let's turn to your ATR-FTIR outlook work.

14       Now, if there are two different materials mixed

15   together within your bead, you will get a different spectrum

16   than either of the spectrum for the materials individually.

17   Right?

18   A   So, if you have two materials, two separate materials,

19   and you take those spectra and then if you take a spectrum

20   of the mixture, the spectrum of the mixture is going to be a

21   result of not only the weight percent based on those two

22   materials and the combination of those individual bands.

23   Q   So when you're looking the at the area of a sample and

24   the sample is a mixture of components, the spectrum that

25   results from that area will be a mixture.  Right?
```

1    A    Yes, it will be a mixture spectrum.

2    Q    So if both HPMCP and talc are in the same area you're

3    looking at, the spectrum will show both.  Right?

4    A    Yes.  But again, keep in mind that talc is significantly

5    stronger in absorption strength than the HPMCP.

6    Q    Now, you talked about Dr. Davies TIR testing.  Right?

7    A    That is correct.

8    Q    And in your analysis, you did not take into

9    consideration the properties of the surface of Impax's beads

10   after it had been washed with acetone and water.  Right?

11   A    Again, I saw no need to actually wash the bead.  We

12   looked at the cross-sections as received and intact.  We did

13   not treat the beads chemically because that alters the bead.

14   Q    The answer to the question is that my statement was

15   correct.  Right?

16   A    The answer is that --

17             THE COURT:  He answered the question.  He answered

18   the question.  I'll accept the answer that I heard.

19   BY MR. CONDE:

20   Q    Okay.

21             So let's go to ITX 431.  I think that's in your

22   book.  And turn to page Sommer 316.

23   A    ITX what again?

24   Q    431.

25   A    431.

1    Q    Sommer 316.

2         Okay.  So if you look at that page, on the left --

3    A    I'm still --

4    Q    -- you have imaging and you have another image

5    corresponding to the same location on the right.  Correct?

6    A    Is this Sommer 316?

7    Q    Yes.

8    A    Well, the image up on the screen does not correspond to

9    what's in the book.

10   Q    There you go.  It does.  Right?  On the right-hand side?

11   A    Okay.  Hold on -- hold on.

12   Q    You see on the right-hand side it says, "Sommer 316"?

13   Maybe you're just not in the right place.

14   A    Sommer 316.

15        Yeah.  The image that I have here doesn't

16   correspond to that number.

17        THE COURT:  Why don't you just refer to the images

18   on the screen?  That's what it's there for.

19   A    Okay.

20   Q    All right.  Okay.

21        So the image on the left, the two images are in the

22   same location.  Correct, Dr. Sommer?

23   A    That is correct.

24   Q    And on the left you say that the image is HPMCP

25   specific.  Right?

1    A    That is correct.

2    Q    And you identify the peak 1722.  Right?

3    A    That is correct.

4    Q    And you say that it's HPMCP specific because you were

5    focused on this 1722 wavelength.  Right?

6    A    That is correct.

7    Q    And THAT wavelength is distinct for HPMCP.  Right?

8    A    That is correct.

9    Q    And on the right you have a wave number of -- well, let

10   me start over.  A wave number of 1008.  Right?

11   A    That is correct.

12   Q    And then in brackets you say that that wave number is

13   talc specific.  Right?

14   A    Yes.

15   Q    And if you look at this image on the right, the green is

16   supposed to designate the presence of talc.  Right?

17   A    That is correct.

18   Q    So based on your image on the right, there's talc

19   throughout the outer coating of the Impax pellet.  Right?

20   A    Well, what I said in my earlier description here is the

21   green area here is where talc is mixed with HPMCP.  So you

22   have talc in a slightly lower concentration than the red and

23   yellow areas.

24   Q    But the whole layer that you've got on the screen where

25   it's green, that's all designated talc.  You don't

1    differentiate between where HPMCP is versus where talc is on

2    the right panel of that image.  Right?

3    A    Well, again, the image is tuned for talc.  So we're

4    looking at the wave number for talc, 1008.  Now I --

5    Q    And -- and in that image you see some patches of red and

6    yellow right on the right-hand corner, on the right hand

7    panel you see red and yellow.  Right?

8    A    Yes, that's correct.

9    Q    And you don't know what the relative amount of the

10   signal that's coming from talc is as opposed to other

11   ingredients from your mapping.  Correct?

12   A    I can go in and I can pull an individual spectrum out at

13   any given location, and I can do a modeling experiment which

14   would give me the concentrations.

15   Q    You didn't do any of that experiment for this

16   litigation, did you?

17   A    No, I didn't need to.

18   Q    Okay.

19        So could you turn to page 251 of your deposition,

20   sir, and actually start at page -- yes, 251, line 24.

21   A    251, line 24.  Okay.

22   Q    Right.

23        And were you asked this question and did you give

24   this answer.

25        "Question:  And do you know the relative amount of

```
 1    that signal that would be coming from talc?

 2              "Answer:  No."

 3              And you go on, but I don't think you gave -- I'll

 4    go on and read the rest just for completeness.  "Again,

 5    because I don't know -- I don't know in the analysis that we

 6    were requested to do, we were not asked to give quantitative

 7    analysis of material, all we were asked to do was to detect

 8    the presence of an enriched layer at the core, extended

 9    release coating interface, and we did not.  All of our data

10    shows that the layer does exist."

11              Were you -- were you asked that question and did

12    you give that answer?

13              MR. SCHEFFEL:  All right.

14              Your Honor, objection.  I think he misread that.

15    It does not say --

16              THE COURT:  Mr. Scheffel.

17              MR. SCHEFFEL:  Sorry, Your Honor.

18              MR. CONDE:  It does -- it says the layer does not

19    exist.  I apologize if I misspoke.

20    A    So I'm missing your point.

21    Q    Could you please just answer my question.

22              Were you asked that question and did you give that

23    answer?

24    A    Well, could you repeat the question?  Because I'm

25    missing the point you're trying to make.
```

```
 1                    THE COURT:  Go ahead, repeat the question and let's
 2      see.
 3      BY MR. CONDE:
 4      Q   Okay.
 5                    The question, "do you know the relative amount of
 6      that signal that would be coming from talc?
 7                    "Answer:  No."
 8                    Were you asked that question and did you give that
 9      answer?
10                    THE COURT:  Yes, he did.
11                    THE WITNESS:  Yes, I did.
12                    THE COURT:  If it's there you did.
13                    THE WITNESS:  But --
14                    THE COURT:  So now the next question.
15      BY MR. CONDE:
16      Q   Okay.
17                    Now can we just go to slide seven of Dr.
18      Sommer's -- okay.  I just want to clarify something.  You
19      didn't pull out and display any particular area of your
20      Raman of your ATR-FTIR mapping that's displayed on the left
21      there, you didn't pick out and display any of the individual
22      spectra in your report.  Right?
23      A   In what?
24      Q   Well, let me ask the question.
25                    Where did this spectra come from, this image?
```

1   A    That spectra came from this red dot there.

2   Q    Okay.

3        And you didn't provide this spectrum on the right

4   and identify that it came from that red dot there in your

5   report, did you?

6   A    I provided all 16,384 spectra in the files.

7   Q    In your report you don't provide the spectrum on the

8   right and identify any red dot on the left.  Correct?

9   A    In my report I identified the red dots as in the yellow

10  areas as being talc.

11  Q    Okay.

12       So let's talk about that a little more.

13       In the red and yellow areas you also see talc

14  marked with HP 50.  Right?

15  A    The HPMCP, yes.

16  Q    So even in these red and yellow areas for your image

17  that's tuned for talc, it could have HPMCP in it as well.

18  Right?

19  A    Well, again, if you look at the spectrum here, you see

20  talc bands and there's a little bump there for 1722.  That's

21  typical.

22  Q    And so when you said talc specific in your expert

23  report, you did not mean talc pure images.  Right?

24  A    The terminology that's used in the field is that when

25  you're presenting these images you tune to a band

JOHN KEVIN STONE, CSR

```
 1   characteristic for the material.  So you have a level of
 2   specificity, yes.
 3   Q   So could you go to slide five of your demonstratives,
 4   please.  Could you go to that slide.
 5          And on this slide you show two -- you show a grid
 6   of your work on the right.  Right?
 7   A   That is correct.
 8   Q   And each box is 10 microns by 10 microns.  Correct?
 9   A   That is not correct.  This slide was just made for
10   demonstration purposes.
11   Q   Well, the slide, when you look at the grid, it's 10
12   microns by 10 microns for each box.  Right?
13   A   Well, I haven't counted the boxes, but in the real world
14   at least, in the instrument, each one of these boxes is 1.6
15   by 1.6 micrometers in dimension.
16   Q   So just so I'm clear, I don't want the nomenclature to
17   get anyone confused, you're saying it's 1.6 microns by 1.6
18   microns?
19   A   Yes.
20          If you take a pixel on the detector and trace it
21   back to the sample position, at the sample position the
22   detector shows up as a 1.6 by 1.6 micron spot.
23          Now, I said earlier that our spatial resolution is
24   half the wavelength, which is a five micron spot.
25          So if you think about it, for each five micron spot
```

```
1    that we're looking at in the image, we're oversampling by a
2    factor of three.  We're actually doing an experiment three
3    times, and that's the difference between pixel resolution
4    and spectral resolution.
5    Q   So just so we're all clear, on slide five of your
6    demonstratives, when you have the grid for your experiment,
7    that does not accurately portray the dimensions of each
8    individual box.  Right?
9    A   No, it does not.  Because if we would have tried to
10   accurately portrayed it we couldn't have seen the boxes, the
11   detail would have been too small.
12   Q   Now -- now, you're aware that there's areas in your
13   imaging where the talc overlaps the HPMCP signal.  Right?
14   A   Again, in my slide that I showed it's a moot point,
15   because talc is seven and a half times stronger, infrared
16   absorbing the signal that we see for talc is significantly
17   higher than it is for HPMCP.
18   Q   So, Dr. Sommer, there are areas on your images where you
19   co-detect in the same location HP 50 or HPMCP and talc.
20   Right?
21   A   Yes.
22       But again, co-detect, you know, we've got talc, you
23   know, okay, we're looking at the sun, that's the intensity
24   of talc, and then we look at HPMCP, and that might be the
25   intensity of the moon.  And if you have those two together
```

```
 1     you're going to see specifically talc.

 2     Q   Would you go to our slide number seven, please.

 3              Okay.  So on this slide we've got this is pellet

 4     one, first location, that was in your expert report.  Right?

 5     A   That is correct.

 6     Q   And we carefully drew a box on the HPMCP image and we

 7     see red in that box.  Right?

 8     A   That is correct.

 9     Q   And the red's designating HPMCP.  Right?

10     A   That's correct.

11     Q   And if we look at the box to the right, we also see red

12     in the box to the right at about the same locations as the

13     box to the left.  Right?

14     A   That's correct.

15     Q   So if you look at these locations, you can't tell at any

16     particular location whether you're seeing only HPMCP or only

17     seeing talc.  Right?

18     A   Well, again, what you have to consider in looking at

19     these images here, you can see a negative of this particle

20     here, this is HPMCP -- or this is the talc and this is a

21     negative image.  But one thing you have to consider is that

22     that talc particle could be half a micron thick in depth.

23     And so what you're actually doing is you're interrogating

24     through the talc particle into the HPMCP.

25              THE COURT:  Could I see your laser, please, Doctor?
```

1                THE WITNESS:  Oh, sure.

2                THE COURT:  This is an image of an unwashed bead.

3      Correct?

4                THE WITNESS:  Yes.

5                THE COURT:  Unwashed pellet.  Correct?

6                THE WITNESS:  HPMCP.

7                THE COURT:  And you made an observation through

8      your ATR-FTIR examination.  Correct?

9                THE WITNESS:  Correct.

10               THE COURT:  And in your observation did you make --

11     were you -- you testified to this, I just want to be sure I

12     understand.  Did you discern any noticeable differentiation

13     in this area that would suggest to you that there's a layer

14     within this area, a separate layer within this area?

15               THE WITNESS:  No, I did not.

16               THE COURT:  And this is the area, Mr. Conde, that

17     Dr. Davies washed and did an examination of after the wash.

18     Correct?

19               MR. CONDE:  That's correct.

20               THE COURT:  Okay.

21               And his testimony and opinion is that during the

22     wash a portion of this layer was dissolved.  Correct?

23               MR. CONDE:  Yes, Your Honor.

24               THE COURT:  And what was left, his opinion is, is

25     the stabilizing layer.  Correct?

```
 1                    MR. CONDE:  Correct.

 2                    THE COURT:  All right.

 3                    But this Doctor is testifying that in his

 4          examination, as he examined throughout this layer, he did

 5          not discern any noticeable differentiation or composition of

 6          the materials in that layer.

 7                    Is that correct, Doctor?

 8                    THE WITNESS:  That is correct.

 9                    THE COURT:  I don't think we need too much more

10          time on this.

11                    MR. CONDE:  Okay.

12                    THE COURT:  I understand the issue.

13                    MR. CONDE:  Okay.

14                    THE COURT:  I mean you have a doctor who testified

15          as to what he did, and he says what's left is a layer.  This

16          doctor is testifying he examined this area, and it's of the

17          same composition throughout.  So that's what the Judge is

18          here for, eventually.  You know, I mean --

19                    MR. CONDE:  Our only point --

20                    THE COURT:  You're going way beyond my

21          comprehension.

22                    MR. CONDE:  Okay.

23                    THE COURT:  When you start to talk about some of

24          that, some of this, you're going way behind almost anyone's

25          comprehension.
```

```
 1                  MR. CONDE:  I understand.

 2                  THE COURT:  Issue before me is, who's the more

 3       reliable source, who gives the better spin, who's the more

 4       reliable expert.

 5                  MR. CONDE:  Right.

 6                  THE COURT:  You have one expert who says he did

 7       certain things.  I have four experts who said they did it,

 8       what is pretty much accepted in the field, in terms of

 9       examination, what your doctor did as well.  He did these in

10       his own way.

11                  MR. CONDE:  Right.

12                  THE COURT:  He's standing up here saying, what he

13       did is correct, everything everybody else did is wrong.

14                  MR. CONDE:  Yes.

15                  THE COURT:  I have to call it.  I don't know how

16       much more I need of this.  You know.  If I gave lawyers in

17       patent cases 60 hours, they would take 60 hours.  If I gave

18       them 15 hours, they would take 15 hours.  The truth.

19                  Matter is, I've had it about up to here.  And

20       unless you all have something much more relevant, let's get

21       on with it.  Because I'm not sure I even want to spend

22       tomorrow doing this again.

23                  MR. CONDE:  All right.

24                  THE COURT:  Because all you're doing is arguing

25       now.  You know, you're not creating helpful evidence.
```

```
 1      You're both arguing your positions.

 2              I know the positions.  I've known it for a day and

 3      a half now or more.  Okay?

 4              MR. CONDE:  Appreciate, Your Honor.

 5              The only purpose of this is to show that this goes

 6      to the reliability of the testing.  And that's what we're

 7      trying to show.

 8              THE COURT:  And your doctor says his testing is

 9      absolutely reliable, and this doctor is saying no, Mr.

10      Conde, and this doctor is saying he's got the better test.

11              MR. CONDE:  I know -- yes.

12              THE COURT:  You know, I'll call it at some point.

13              The Federal Circuit will call it.

14              You're making your records.  I've given you all

15      ample time to, you know, make your records.  If there's

16      really something probative in making your record, go ahead.

17      That's what I've been doing here.  Trying to give you each a

18      chance to make a sufficient record, so if I call it wrong

19      for one of you, you'll have a record to go up on.  Okay?

20      You know, I'm finishing this case tomorrow.

21              MR. CONDE:  You know, Your Honor, we're with you.

22      We're set to finish tomorrow.

23              THE COURT:  You know, come hell or high water this

24      case is over tomorrow at 4 o'clock.  So I mean, come on,

25      fellows, I mean you know I've given you a lot of time, a lot
```

```
 1    of consideration, all of you.

 2              MR. CONDE:  You have, Your Honor.

 3              THE COURT:  So focus in on what you want to get in

 4    the record in the next day and a half and let's do it.

 5              MR. CONDE:  Okay.

 6    BY MR. CONDE:

 7    Q    I have one more question on -- with regard to the talc,

 8    you know, that there's a specific peak for talc that's at

 9    666.  Right, Dr. Sommer?

10    A    That is correct.

11    Q    Okay.

12              And you didn't use, your instruments are uncapable

13    of the detecting the specific peak for talc.  Right?

14    A    That's correct.  Our instrument cuts off at 720 wave

15    numbers.

16    Q    So if your instrument was able to see 666 wavelength,

17    you could give a specific image as to talc.  Right?

18    A    Yes, I could.

19    Q    Could you go to paragraph 46 of Dr. Sommer's report.

20              Could you blow-it up.

21              So this is the paragraph in your expert report

22    where you mentioned the band shifts.  See right there in

23    like the third line, four, five from the bottom?

24    A    That is correct.

25    Q    And you don't mention anything about an acetone wash
```

1      causing the band shift.  Right?

2      A    Well, no, it says right there, Dr. Davies ATR-FTIR data

3      on the acetone wash DRC contains evidence of a band shift.

4      Q    I apologize, I misspoke.  I should have been more

5      precise.

6           You don't say there anything about an acetone

7      residue on the outside of the bead, do you?

8      A    No, not in my expert report.  But in my deposition I

9      clearly showed that the presence of acetone could explain

10     that band shift.

11     Q    Did you see any acetone peaks in Dr. Davies' ATR-FTIR

12     data on the washed beads?

13     A    Again, when you do these analyses, the peak for HPMCP

14     and acetone is very close to one another.  The only way that

15     you can figure out whether that's there is to do the

16     modeling experiment that we did and we provided in the

17     deposition.

18     Q    And you agree -- now, Dr. Davies had a different

19     explanation for the band shift.  Right, Dr. Sommer?

20     A    Yes.  If I recall correctly, in Dr. Davies' rebuttal to

21     my expert witness report, he noticed an upward band shift.

22          So if you look at HPMCP by itself, actually, in his

23     data, HPMCP by itself has a band at 1725.  In the formulated

24     product, because you're mixing it with a triethyl citrate,

25     that band shifts up approximately three wave numbers.

1           Now, in Dr. Davies' washing step, when he hits it

2     with acetone, it removes the TEC.  So the band shifts back,

3     should shift back to the normal position for HPMCP.  But

4     what we saw was a further shift downward of about three wave

5     numbers, and that indicates to me that there was still

6     residual acetone remaining in the beads and the spectra that

7     he recorded.

8     Q   And you understand that Dr. Davies' explanation was

9     based on actual data from his testing?

10    A   I didn't see any data, I just saw his rebuttal statement

11    to my expert witness report.

12    Q   Did you apply the removal of TEC to your computer model

13    for the band shift?

14    A   Yes, at some later point I did, and that was confirmed.

15    Q   You hadn't done that as of the time of your deposition

16    though.  Right, Dr. Sommer?

17    A   That is correct.

18    Q   So at your deposition you didn't know what the results

19    would have been for the computer modeling removing TEC.

20    Right?

21    A   No, that is correct.

22          But I did know the results for the shifting of the

23    HPMCP band as a result of mixing with acetone.

24    Q   And you agree that the band shift could be caused by the

25    removal of TEC.  Right?

```
 1    A    Can you tell me which band shift you're talking about?
 2    Q    I'm sorry.  You agree -- well, in the band shift that
 3    you were referring to could have been caused by the removal
 4    of TEC.  Right?
 5    A    Yes.
 6              MR. CONDE:  I have nothing further, Your Honor.
 7              THE COURT:  All right.
 8              Thank you, Mr. Conde.
 9              Any redirect?
10              MR. SCHEFFEL:  No, Your Honor.
11              THE COURT:  All right.
12              Doctor, you can step down.
13              THE WITNESS:  Thank you.
14              ( Witness excused ).
15              THE COURT:  We'll take a recess until five after,
16    please.
17              MR. WEISBLATT:  Your Honor, I know Mr. Conde was
18    able to tell you, I believe it's almost a certainty that we
19    will be done with this case in the time you just mentioned.
20    We do have to create a record, but we will be done, in fact
21    I hope to be done earlier.  But we will be done.
22              THE COURT:  I know.  I'm just saying.
23              MR. WEISBLATT:  But I --
24              THE COURT:  I don't want to shortcut anybody.  But
25    you know, we have an estimate, we're on target anyhow.
```

 1                MR. WEISBLATT:  Yes, Your Honor.

 2                THE COURT:  But I just want to be sure that you

 3      don't waste time -- not waste time, but you know, I mean

 4      look, I understand the respective positions.  You know, as

 5      best I can.

 6                Some of the technicalities you get into are, you

 7      know, only they, Doctor and Dr. Davies would fully

 8      understand, and you.

 9                But I have an understanding as to, you know, what I

10      have to decide, and so -- and I'm, you know, I think you're

11      almost done with the affirmative case anyhow.  Correct?  You

12      have another witness?

13                MR. WEISBLATT:  Yes, Your Honor.

14                Again, we have Dr. Kibbe.

15                THE COURT:  Okay.

16                MR. WEISBLATT:  Who will perform essentially the

17      same function as I believe it was Dr. Bucton in the Mylan

18      case.

19                THE COURT:  Okay.

20                MR. WEISBLATT:  And again, Your Honor, you also

21      mentioned yesterday in passing that, you know, if we had to

22      go longer and take heroic efforts to finish, in looking at

23      what's left, we don't need to do that.  We have Dr. Kibbe

24      and then we have an adverse witness we're going to call, and

25      then we have the invalidity case, which is Dr. Kibbe and Dr.

```
 1    McGinty.  I do not believe --
 2              THE COURT:  Are those the two witnesses as to the
 3    invalidity case?
 4              MR. CONDE:  Yes, Your Honor.  There's only two.
 5    And any -- the adverse witness, which I think should only
 6    take probably about a half hour at most.  I don't believe we
 7    have any issue with heroic method or staying.
 8              THE COURT:  Okay.  I just want to impress upon you,
 9    you know, you understand we'll be done.
10              All right.  We'll see you at five after 11.
11              MR. WEISBLATT:  Thank you, Your Honor.
12              THE COURT:  Thanks.
13              ( After a brief recess court resumed ).
14              THE CLERK:  Please remain seated.
15              THE COURT:  Okay.  Ready to proceed?
16              MR. PACELLA:  Yes, Your Honor.
17              THE COURT:  All right.
18              Go ahead, counsel.  Introduce our next witness.
19              MR. PACELLA:  And I forgot to introduce myself the
20    other day, I'm Mark Pacella representing Impax.  And the
21    next witness is Dr. Arthur Kibbe.
22              THE CLERK:  Left-hand on the Bible, raise your
23    right hand.
24    D R.   A R T H U R    H.    K I B B E, sworn.
25              THE COURT:  Okay.
```

```
 1                THE CLERK:  Please state your full name and spell
 2      it for the record.
 3                THE WITNESS:  Arthur Hamilton Kibbe.  A-r-t-h-u-r,
 4      H-a-m-i-l-t-o-n, K-i-b-b-e.
 5                THE CLERK:  Sir, you may be seated.
 6                MR. PACELLA:  Your Honor, may I approach.
 7                THE COURT:  Sure.
 8                MR. PACELLA:  These ones are a little thick.  I
 9      apologize.
10                May I proceed, Your Honor?
11                THE COURT:  Sure.  Go ahead.
12      DIRECT EXAMINATION
13      BY MR. PACELLA:
14      Q   Good morning, Dr. Kibbe.
15      A   Good morning.
16      Q   Dr. Kibbe, you understand that the plaintiffs contend
17      that Impax's proposed doxycycline hyclate tablets infringe
18      certain claims of the 161 patent?
19      A   I do.
20      Q   You are here today to offer your opinions regarding
21      those allegations?
22      A   I am.
23      Q   What is your opinion?
24      A   I do not think that the Impax product infringes the
25      claims of the 161 patent.
```

1    Q    Where are you presently employed?

2    A    I'm employed at the Wilkes University's Nesbitt School

3    of Pharmacy.

4    Q    And how long have you been there?

5    A    I began my employment there in 1994.

6    Q    What is your position?

7    A    I'm a professor and chairman of the pharmaceutical

8    sciences department.

9    Q    Do you teach?

10   A    I teach, provide service on a committee work and do some

11   research and oversight, yes.

12   Q    What sort of classes do you teach?

13   A    I teach basic dosage form, design and dosage form

14   evaluation for pharmacy students who are becoming

15   pharmicists in the community.

16        I also teach a class in bio-pharmaceutics and

17   pharmacokinetics.  I teach formulation and manufacturing to

18   our undergraduates who are enrolled in the Bachelor of

19   Science and pharmaceutical sciences, which leads them to be

20   technicians in the formulation or formulating area.

21   Q    When you say "formulating," what do you mean?

22   A    Formulating is the discipline within the pharmaceutical

23   industry that is involved with taking an active

24   pharmaceutical ingredient and converting it to a use dosage

25   form to be used by the patient or caregiver.

```
 1   Q    Will you please briefly describe your educational
 2   background.
 3   A    I graduated from Columbia University in 1966 with a
 4   Bachelor's Degree in pharmacy.
 5        I then matriculated at the University of Florida
 6   and obtained a Masters Degree in pharmaceutics in 1968.
 7        I was then asked to serve two years of sabbatical
 8   with the military in Southeast Asia, and I returned to
 9   graduate school and finished my PhD in pharmaceutics at the
10   University of Florida in 1973.
11   Q    And what is "pharmaceutics"?
12   A    Pharmaceutics is the science that's involved with the
13   dosage form and not the active ingredient.  So that the
14   different disciplines within pharmacy include those that are
15   the care, about how the active ingredient works in the body,
16   and those that care about how we can develop a delivery
17   system for that active ingredient that gives us the best
18   outcome in the patient.
19   Q    And have focused on any particular aspects of
20   pharmaceutics during your career since you obtained your PhD
21   back in 1973?
22   A    Yes.
23        I was very interested in delayed release or
24   extended release dosage forms when I was training as a PhD
25   student.  One of my professors was a gentleman by the name
```

```
 1      of Reed Blythe, who invented the **Spansol which was the
 2      first patented delayed release bead system.  So most of my
 3      career I've kind of looked at oral solid dosage forms, I've
 4      looked at delayed release methodology for oral dosage forms,
 5      evaluation of dissolution and the relationship between
 6      dissolution numbers and the pharmacokinetics of the drug.
 7      Q   Okay.
 8              And I don't know if you mentioned the word
 9      excipients, but what is an "excipient"?
10      A   I'm sorry, I should have.
11              Excipients are the materials that are used to make
12      a dosage forms that have no pharmacological effect.
13      Q   So everything other than the active ingredient?
14      A   Yes.  They're all the inactive ingredients in the dosage
15      form.
16      Q   What's your experience dealing with excipients?
17      A   I have had the opportunity to work closely with the
18      steering committee and actually be the editor of the Third
19      Edition of the Handbook of Pharmaceutical Excipients, which
20      lays out into monograph form the characteristic of
21      excipients, what they're used for, what you can expect to
22      expect with the use of them, and what they are, their
23      characteristics in terms of their physical and chemical
24      nature.
25      Q   Okay.
```

```
 1              Prior to joining Wilkes University, did you teach
 2    at other universities?
 3    A    I did a stint at the University of Mississippi for
 4    approximately ten years.
 5              I was thereafter at the National Institutes of
 6    Health as Chief of Pharmaceutical Development for a couple
 7    years.  We provided pharmaceutical services in terms of
 8    formulation development for the intramural work done at the
 9    institute in Betheseda, Maryland.
10              Then I worked in industry.  I was Chief of the
11    Scientific and Professional Affairs for the American
12    Pharmaceutical Association, and I continued my involvement
13    with the Food and Drug Administration as a member of the
14    Pharmaceutical Sciences Advisory Committee which I chaired
15    from 2002 to 2004.
16    Q    Okay.
17              What did you teach at the University of Mississippi
18    for ten years?
19    A    I taught basically the same things I teach now, except
20    that at the University of Mississippi we had both
21    undergraduate and graduate degree programs, and so I trained
22    formulators who went out in the industry and worked as
23    senior formulators in various companies in the United
24    States.
25    Q    Have you been a reviewer or editor for scientific
```

1      publications in the field of pharmaceutics?

2      A    Yes.  I've had an opportunity to be a reviewer in a

3      number of journals.  Most recently, Pharmaceutical

4      Development, and of course the Journal of Pharmaceutical

5      Sciences, which was the, I guess you'd call the flagship of

6      our industry.

7      Q    In the course of your work, do you keep up to date with

8      the scientific literature in the field of pharmaceutics?

9      A    Yes.  In order to continue to be able to consult, to do

10     research and to teach on the areas you have to keep up with

11     the literature.

12     Q    And you mentioned the Handbook of Pharmaceutical

13     Excipients.  Again, what role did you play with respect to

14     that?

15     A    I've been on the steering committee for the handbook

16     since the Second Edition and continue to this day doing

17     that.

18          I wrote monographs for the handbook which are in

19     the various editions, and I was Editor-in-Chief of the Third

20     Edition, wherein we did a lot of testing ourselves to add

21     information to the monograph from direct testing by

22     volunteers within the steering committee.

23     Q    And is the Handbook of Pharmaceutical Excipients a

24     recognized reference for those who work in the field of

25     pharmaceutics?

1    A    Yes.   It's internationally known as a reliable reference

2    with respect to the characteristics of excipients.

3    Q    Have you contributed to or co-authored any other

4    portions or books -- portions of books such as chapters?

5    A    I wrote a text for the Encyclopedia of Pharmaceutical

6    Technology on the generic drug process, and then I've

7    written a chapter on the theory of dissolution for a book on

8    dissolution theory, methodology and testing.

9    Q    And do you have a curriculum vitae that provides

10   additional detail about your educational training and

11   professional background?

12   A    Yes, I do.

13   Q    Could you please turn to ITX 657?

14   A    Yes.

15   Q    And do you recognize that?

16   A    Yes, it is my curriculum vitae.

17   Q    Does that document accurately reflect your professional

18   background?

19   A    Yes, it does.

20            MR. PACELLA:  Your Honor, Impax offers Dr. Kibbe as

21   an expert in the design, manufacture and evaluation of

22   pharmaceutical dosage form, including modified release

23   dosage forms.

24            MR. CONDE:  No objection.

25            THE COURT:  All right.

1           Without objection he's so qualified in that area.

2           Thank you.

3      BY MR. PACELLA:

4      Q    Okay.

5           Dr. Kibbe, let's talk about your opinion that

6      Impax's product does not infringe the claims of the 161

7      patent.

8           Now, I understand you were unable to attend the

9      trial last week because you had some teaching commitments?

10     A    I'm a full time faculty member and actually should be

11     teaching today, and this week I managed to get some coverage

12     from my colleagues.  But I couldn't get as much coverage to

13     be here for the whole time.

14     Q    Okay.

15          But did you read the transcript of Dr. Davies

16     concerning Impax's doxycycline hyclate delayed release

17     tablets before today?

18     A    I did read the transcript.

19     Q    Did you prepare some sides that would help you in

20     explaining what you'd like to discuss with the Court today?

21     A    Yes, I did.

22     Q    Do you have a slide that highlights the key claim

23     limitations that you're going to be discussing today?

24     A    Yes, I believe it's slide one.

25          MR. PACELLA:  Could we have slide one.

1    BY MR. PACELLA:

2    Q    Doctor, could you explain slide one?

3    A    What I've selected was the two independent claims of the

4    161 patent, and I've highlighted I think the two key

5    elements in determining whether or not Impax's product

6    infringes.

7             First that the patent calls for a modified release

8    preparation.  And of course, preparation is broad, and it

9    includes various kinds of pharmaceutical dosage forms.  The

10   20 -- Claim 20 limits it to a tablet.  And that tablet being

11   a modified release preparation.  Okay.  So Claim 1 could

12   have also covered capsules or other methodologies.

13            The second thing I highlighted is I think the crux

14   of the discussion, and I've been here listening to all the

15   experts talking about whether or not there is a stabilising

16   coat.  And in addition, the issue, the crux I think of the

17   issue wherein a stabilising coat is provided between each

18   core element and its modified release coat.

19   Q    Is it your understanding that these are the only two

20   independent claims that are being asserted?

21   A    Yes, it is.

22   Q    So, and your understanding that each of the limitations

23   of these two claims is required in each of the other claims

24   that have been asserted against Impax?

25   A    That's my understanding.

1    Q   Now, did you review the 161 patent in connection with
2    reaching your conclusions in this case?
3    A   I did.
4    Q   And did you consider the Court's claim construction of
5    the, specifically these two terms in reaching your
6    conclusions?
7    A   I did.
8            We have a slide with the Court's claim construction
9    on it.
10   Q   Sure.
11           MR. PACELLA:  Can we go to slide two, please.
12   BY MR. PACELLA:
13   Q   Dr. Kibbe, can you explain what your summary of your
14   opinions is based upon the claim construction?
15   A   Right.
16           The core construction is that a layer of material
17   in between each core element of a modified release coating,
18   that's a very good description of what I think was intended
19   by the patent, and that is not present in the Impax product.
20           Second, the Court, it says it keeps the migration
21   of co-materials to -- core materials to a minimum, etcetera.
22   And of course that comes directly from a quote within the
23   patent itself.
24           But there have been no testing done on any of the
25   product, Impax product that shows that this alleged coat

```
 1    which Dr. Davies claims is really there actually does keep
 2    migration to a minimum or contribute to the dissolution
 3    stability.  Okay?
 4         Next, we talk about the modified release
 5    preparation.  And the modified release preparation is the
 6    completed tablet.  All right?
 7         And there was no testing that showed that the total
 8    modified release preparation provides its claim dissolution
 9    stability in and of itself.
10    Q   Okay.
11         We'll get -- drill down into this as we go.
12         Let's first talk about the term "modified release
13    preparation."
14              MR. PACELLA:  Can we see slide three.
15    BY MR. PACELLA:
16    Q   Doctor, can you explain what's depicted on slide three?
17    A   Okay.  We had highlighted again from Claim 1 the same in
18    Claim 1, a preparation provides a release profile for an
19    active ingredient that's different from an immediate release
20    preparation.  Which means that the dosage form itself is the
21    preparation, the tablet or capsule, or whatever you actually
22    give to a -- to a patient.  And that preparation is to have
23    the release profile, and in fact the stability of the
24    release profile according to this patent.
25    Q   So you have some slides there to help explain why it is
```

1     that your opinion is the modified release preparation

2     according to the claim construction is in fact the tablet or

3     the final dosage form?

4     A   Yes, I do.  We have another.

5              MR. PACELLA:  Slide four, please.

6     A   I've stylized this so we could go through it quickly.

7              The dissolution medium is, the dissolution

8     apparatus is usually prescribed by the United States

9     Pharmacopea, USP, and it's approved or accepted by the FDA.

10    And we do standard testing on every batch of solid dosage

11    forms that are intended for oral administration.

12             And what we do is we take the actual dosage, and we

13    put it in a medium at a certain temperature, with a certain

14    number of RPMs, on a paddle, stirring it, and we collect

15    samples of that fluid over time, and measure the percent of

16    the drug that has been released from the dosage form.

17             And what I tried to show is the difference between

18    an immediate release, which gives you a very rapid uptake

19    and finishes delivering all the drug in a very short period

20    of time, and a modified release, which is what we're talking

21    about here, which will give you a very slow release of drug

22    over time.  These are stylized and not to be confused with

23    any real data about the Doryx or anybody's product.

24    Q   Okay.

25             And so what's being tested when you are talking

1    about a release profile as opposed to stability of the

2    release profile is the tablet itself?

3    A    Yes.

4    Q    Does the container tablet -- I'm sorry, does the

5    container that the tablet or the capsule or what you have

6    tested is in -- let me start over.  I'm sorry.

7         Does the container that the tablet is packaged in

8    have any influence on the dissolution profile that is

9    produced by the modified release preparation?

10   A    No.  It's -- obviously you don't take the whole bottle

11   and throw it in the dissolution preparation.  What you do is

12   take the modified release preparation for dissolution and

13   you take it out of the container.

14   Q    Do things such as the dessicant or the cotton, things

15   like that that are placed in the bottle, does that have any

16   influence on providing a release profile?

17   A    No.

18   Q    Sod does the term "modified release preparation,"

19   include the bottle sealed, cotton, dessicant, things like

20   that outside the tablet?

21   A    No, it's just the tablet itself.

22   Q    Okay.

23        Let's move on to the stabilising coat.

24        You heard a lot of testimony when you were here,

25   when the experts for Impax testified about their view as to

1     the stabilising coat in -- on Impax's product?

2     A    I was here for of Dr. Sodhi's and Dr. Sommer's testimony

3     about their testing of the possibility of a presence of

4     that, yes.

5     Q    And you were -- and again, I believe you said you read

6     Dr. Davies' testimony on that issue?

7     A    I did.

8     Q    Does the patent --

9            MR. PACELLA:   I just wanted to walk through, Your

10    Honor, you might have heard something about this from Dr.

11    Buckton.   I just wanted to try to clarify this.

12    BY MR. PACELLA:

13    Q    Dr. Kibbe, have you prepared some slides that would

14    describe, according to the patent at least, how the modified

15    or the stabilising coat is supposed to work on the shelf as

16    opposed to in the body?

17    A    Yes, I have.

18           MR. PACELLA:   Could we have slide five.

19    A    I hope -- it's a quick animation, and we won't keep the

20    Judge long.

21           When the product is made we have a bead with an

22    active ingredient in it, and that's orange.   And then the

23    stabilising coat, purple, and the enteric or delayed release

24    coat in green.

25           And the patent claims that the function of it is to

1    minimize movement from the core to the delayed release coat

2    or vice versa.  So that's what the patent is talking about.

3    And that's when the product is on the shelf in its

4    container.

5              All right.  When we give the product to the

6    individual, we have the same product, it's in a form in this

7    case of a tablet.  When it enters the stomach it is now in a

8    fluid medium.  And once there, the fluid begins to enter

9    through the membrane.  And these are -- the purpose is

10   really a semi-permeable membrane, so it allows water in.

11             The design of the enteric coat is not a subject of

12   this patent.  But it's designed to allow drug out at the

13   rate that you want it to be let out.

14             The drug in the center dissolves, migrates through

15   the pemeable membrane, through the pores or what have you on

16   the outside, and come out.

17             Now, when it moves from the stomach to the

18   intestinal tract, those two layers dissolve away.  The

19   enteric coat that's used, in this case HPMCP dissolves

20   rapidly in a Ph above five.  In which case it dissolves

21   away.

22             The barrier coat, according to the patent, has to

23   be made of material that will also readily dissolve away and

24   not interfere or change the release of the drug from the

25   core.  And it, the patent suggests HPMCP, and so that also

1          sloughs away or dissolves away rapidly, and then the rest of

2          the ingredients in the core all go into the solution.  And

3          so that way we guarantee that a limited amount of material

4          is released in the stomach and the rest of it is all

5          released as quickly as possible once it gets to the

6          intestinal tract.

7          Q    And what's the difference between why -- what is it that

8          explains why once you ingest the pill and it's in the

9          stomach the layers will dissolve versus what you see on the

10         left-hand side where the layer is supposedly not allowing

11         migration to take place?

12         A    Well, you understand that this is a dry bead in a tablet

13         sitting there.  When you put the tablet either in a

14         dissolution medium or in the stomach it is now surrounded by

15         fluid.  And that fluid, with the water, penetrates into the

16         tablet and begins the process of dissolving away and

17         swelling and material comes out.

18                    The reason we have a reduced amount of material

19         come out in the stomach is because the integrity of the

20         delayed release coat, because of the phthalate derivative of

21         cellulose will not fall apart.  And so it only allows some

22         drug to migrate through this coat.  When it hits the

23         intestinal tract, that whole thing falls apart and then

24         everything comes out.

25                    THE COURT:  Does it fall apart at the same rate,

1       the delayed release coat and the purple stabilising coat?

2               THE WITNESS:  The critical thing to fall apart is

3       the delayed release coat, when water starts to get in there

4       the barrier coat, which is made of something that's water

5       soluable, begins to become hydrated and swell.  And if there

6       was no delayed release coat on it, it would go off right

7       away.  But it's being held there because the delayed release

8       coat surrounds it.

9               Now, as soon as the delayed release coat falls off,

10      the other one's ready to come off and it just drops right

11      off.

12              THE COURT:  Then how does the application of a

13      stabilising coat have any bearing on what the invention is

14      supposed to do, and that is, to minimize dissolution in the

15      stomach and I guess encourage further dissolution in the

16      lower stomach and upper intestine?

17              THE WITNESS:  Okay.

18              THE COURT:  So it's the delayed release coating

19      that has the primary, or keeps the tablet secure until it

20      hits the dissolution material, and you're saying the

21      stabilising coat would come off right away?

22              THE WITNESS:  Okay.  Your Honor, the patent doesn't

23      set the criteria for dissolution.  The patent sets a coat

24      which helps to stabilize that criteria.  And so the

25      dissolution pattern is all controlled by the delayed release

1    coat, the green coat.  The benefit of the barrier coat is

2    that it prevents things from migrating into that coat while

3    on the shelf.  And changing its ability to behave the way it

4    should.

5            So it's kind of like a safety net for the delayed

6    release coat.  When water gets in, in a situation where

7    you're going to put it in either a dissolution medium in the

8    laboratory or a patient is going to swallow it, now we're

9    talking about this tablet sitting in a cup of water.

10           THE COURT:  I understand that.

11           THE WITNESS:   And so once that happens, water

12   starts to migrate in.  And then the whole thing starts to

13   fall apart.  And the coat on the outside will not give away

14   until it reaches the correct acid concentration in the

15   intestine.

16           THE COURT:  And if I'm going beyond your expertise

17   just please so indicate.  But if you just made the delayed

18   release coat thicker, would that accomplish the same thing

19   as having a stabilising coat?

20           THE WITNESS:  The problem with changing the delayed

21   release coat is it will change the dissolution pattern.  The

22   thicker you make that, the slower that pattern will be.  So

23   what has happened is in the prior art, Doryx's capsule, they

24   established an initial manufactured dissolution pattern

25   which is best for the patient in terms of side effects and

1   bio-availability.  That's not in this patent at all.

2            All we're doing here is we're saying once we've

3   developed that coat, and we notice that it begins to degrade

4   with time, how can we keep it working exactly as we intended

5   it to.  If we didn't care about the dissolution pattern

6   staying the same, as we had already decided upon, then sure,

7   we could make the coat thicker.

8            THE COURT:  All right.

9            THE WITNESS:  But it wouldn't give us the same

10  dissolution pattern that we already had.  And this is a

11  patent that improves an already existing product that has

12  certain characteristics.  And if I don't want to mess with

13  those characteristics, then the thing to do is to put a coat

14  in there that stabilizes the already exiting delayed release

15  coat.

16           THE COURT:  All right.  Thank you.

17  A    Okay.  I'm sorry.

18  Q    And I don't want to belabor this slide, but I just had a

19  couple questions on the left-hand side.

20  A    Sure.

21  Q    Now you're describing there what the patent, and I

22  believe you cited, quoted the language underneath --

23  A    That's right.

24  Q    -- how patentees intended the stabilising coat to work.

25  Correct?

1        A    That's correct.

2        Q    And are you saying that in any particular formulation

3    that the stabilising coat is required to prevent migration

4    or that migration would otherwise occur in the absence of a

5    stabilising coat?

6        A    No.   The patent -- the patent and the test data in the

7    patent shows that when they apply this intermediate coat

8    they improve the stability of the dissolution pattern that

9    is taking tablets and storing it for a period of time and

10   then testing dissolution.   Other products don't have a

11   stabilising coat because they don't need it, because the

12   interaction between the delayed release coat and the core is

13   such that it doesn't materially affect the quality of the

14   delayed release coat.   And so you don't need it.

15            Or there is another factor that they've taken care

16   of or included in their product that means that that isn't

17   required.   Very few products have to have this coat.   But

18   this coat has been around since time immemorial almost.

19   When I was an undergraduate they were already talking about

20   using seal coats and coats and these kind of coats to

21   protect coated dosage forms from back in the 30's and 20's.

22   So it's a common enough tool, but it isn't -- doesn't have

23   to be used universally in every single tablet or oral

24   dosage.

25            THE COURT:   Does the composition of the sealed coat

```
 1    make a difference -- obviously, there have to be certain

 2    chemicals that make the seal coat.  Correct?

 3           THE WITNESS:  Absolutely, Your Honor.  You want a

 4    polymeric material that is readily dissolved in water and

 5    absobs water and swells, because you want it out of the way

 6    when you take it.  All right?

 7           You don't want something that's going to make it

 8    even more difficult for the drug to come out, you know.

 9    Q    And --

10    A    If we had time to digress, I'd talk about it a little.

11    Q    Let me ask a little follow up on that, because you cited

12    the language in the body underneath -- underneath the patent

13    language that says, while still allowing for a release of

14    core materials in aqueous environment.  And so according to

15    the patent and according to your understanding of the type

16    of stabilising coat that they describe, will that, should

17    that interfere with the release of the drug once the pill is

18    in the body?

19    A    No.  It's not supposed to.  It's designed not to.

20    Q    And just to be clear, do you have an opinion as to what,

21    whether the mere fact, Impax's product, is there any

22    evidence that without a stabilising coat, have you seen any

23    evidence that without a stabilising coat Impax's products

24    would have this migration issue that is depicted on the

25    shelf as described by the intended use of the patentees?
```

JOHN KEVIN STONE, CSR

```
 1    A    That's the theory that the patentees put forward.  And
 2    there has been no testing that I know of that was performed
 3    to look for migration in the Impax product.
 4    Q    Okay.
 5         MR. PACELLA:  And we'll touch on that a little bit
 6    more later, Your Honor.
 7    BY MR. PACELLA:
 8    Q    Dr. Kibbe, have you reviewed Impax's abbreviated new
 9    drug application?
10    A    I have.
11    Q    And have you seen abbreviated new drug applications in
12    the past?
13    A    Yes, I have.
14    Q    Have you read in Impax's -- can we call it ANDA?
15    A    Yes, that's the revision form.
16    Q    In that document, have you read the descriptions of the
17    ingredients that are used and how the Impax product is made?
18    A    Yes, I have.
19         MR. PACELLA:  Your Honor, we're going to get into a
20    significant area where we're going to describe Impax's
21    product.  Can we seal the record?
22         THE COURT:  Yes.  From this point on the record
23    will be sealed and please indicate when we should unseal.
24         MR. PACELLA:  I will, Your Honor.
25         ( Record sealed ).
```

```
 1    BY MR. PACELLA:

 2    Q   Doctor --

 3                MR. PACELLA:  Can we have slide six.

 4    BY MR. PACELLA:

 5    Q   Dr. Kibbe, can you explain -- this was shown when we had

 6    the opening statement, but you were not here.  But can you

 7    explain, based on your reviews of Impax's NANDA what this

 8    slide shows about the composition of Impax's product?

 9    A   This list comes directly out of the Impax NANDA and I

10    color-coded just to divide it up into it's component parts

11    so it's easy to follow.

12                The active core, which is in orange, includes the

13    active ingredient and then a series of excipients:  Sodium

14    chloride, microcrystalline cellulose, lactose and HPMC and

15    lauryl sulfate.

16    Q   Can I stop you, you said HPCM.  And the slide says

17    hypromellose.  Is that the same thing?

18    A   I apologize.  Hypromellose is the generic of HPMCP,

19    hydroxypropyl methycellulose is what it is chemically, and

20    HPMCP is the abbreviation of the chemical.  And when you

21    work in the industry you kind of throw those names around

22    like you know what you're doing.  Pharmacoat 606 is a

23    particular brand of it.  It's not -- it's just, you know,

24    people make it.  I don't even remember the name of the

25    manufacturer.  But Dow makes it, several other companies.
```

1    Q    Okay.

2         And I didn't mean to interrupt your flow, if you

3    could just please continue with the composition of the Impax

4    product.

5    A    Okay.

6         Then the active core seed, once it's manufactured,

7    is coated with a delayed release coat.  And that includes

8    hypromellose phthalate, or HPMCP, and specifically HP 50.

9    Some additional HPMC, Pharmacoat 606, triethyl citrate,

10   which is a well known plasticizer, and talc, which is in as

11   a anti-sticking agent.

12        Once that coating is completed, those beads are

13   blended with tabletting excipients.  And to make the final

14   blend.  And so the final blend is in white, and it includes

15   the beads, the lactose, corn starch, crospovidone and

16   magnesium sterate and then it's made into a tablet.

17   Q    And the tablet is the modified release preparation?

18   A    Yes, it is.  That's the final preparation.

19   Q    Now, is there any difference in the ingredients that are

20   used to make the Impax different strengths, 75, 100, 150

21   milligram tablets?

22   A    No.

23        What Impax does is they make an active core seed

24   and they coat it with a delayed release seed, and then they

25   use that seed in each one of their strengths by just upping

JOHN KEVIN STONE, CSR

1     the number of seeds, or the weight of seed per tablet, and

2     upping the tote weight of the tablet.  So that all the

3     ingredients are proportional and the tablet weight is

4     proportional in -- on the amount of active ingredient.  So

5     the 150 milligram tablet weighs twice what the 75 milligram

6     tablet weighs.

7     Q    Okay.

8          You mentioned that talc was used in Impax's product

9     as a ingredient or anti-stick agent?

10    A    Yes, that's true.

11    Q    Why do you do that?

12    A    During the process of coating, and we'll see a spray

13    coater and I'll try to explain what goes on.

14         But the beads are being coated with a film in a

15    solvent.  And they become slightly sticky.  And in order to

16    prevent those beads from sticking together during the

17    manufacturing process, we put talc on them.  And so you

18    incorporate talc in the coating liquid or the spray coating

19    solution so that the beads won't stick together, so they'll

20    be discrete, independent beads when they finish the coating.

21    Q    And do you want this talc that's keeping the pellet from

22    sticking together to be all around the pellet, is it the

23    same general amount all through the coating process?

24    A    It has to be uniformly distributed to have its effect

25    during the entire coating process.

1    Q    Is that an unusual use of talc?

2    A    No.

3    Q    Based on your experience and your review of Impax ANDA,

4    is there anything out of the ordinary about any of the

5    ingredients that Impax used to make this type of product?

6    A    No, these are common excipients well-known to be useful

7    in these situations.

8    Q    In looking at the delayed release seed that you had as

9    your middle picture, so to speak, illustration, based on the

10   composition and your review of the manufacturing process,

11   what does that -- that seed, the delayed release seed

12   consist of?

13   A    The delayed release has the active core and a single

14   delayed release coating.

15   Q    Will you turn to ITX 632 in your binder.  And do you

16   recognize ITX 632?

17   A    Yes.

18   Q    And what is ITX 632?

19   A    This is an excerpt from the Handbook of Pharmaceutical

20   Excipients, Third Edition.

21   Q    I see your name on the top cover there.  Is that the

22   edition that you edited?

23   A    That's the edition that I edited, yes.

24   Q    And so what -- can you just generally describe what's

25   contained within ITX 632 without going into every single

1    detail?

2    A    Okay.

3         We have a series of monographs here.   Each

4    monograph describes the characteristics of the excipients

5    that are used in the Impax product.  So all of the Impax

6    product excipients, they're a monograph in here that matches

7    up with them.

8    Q    Okay.

9         And did you find anything that Impax does with its

10   ingredients that's inconsistent with the uses that are

11   explained in the various monographs of Exhibit 632?

12   A    No.

13   Q    Now, based on your experience and your review of Impax's

14   NANDA, would you expect any reaction to occur within any of

15   the ingredients you went through when you were describing

16   the composition?

17   A    No, I wouldn't.

18   Q    Why not?

19   A    Well, these are common excipients that are, have been

20   blended in many different preparations in the past.  I

21   myself have used those myself.  And even Dr. Davies agrees

22   that he would not have expected any reaction to occur.

23   Q    Have you seen anything in the scientific literature that

24   would suggest a reaction could occur between the ingredients

25   of the delayed release layer to the active cores to form a

 1    separate layer between the cores and the delayed release
 2    coat in Impax's product?
 3    A    No.
 4    Q    Have you seen any evidence in this case of such a
 5    reaction that could form?
 6    A    No.
 7    Q    Have you heard any explanations from Dr. Davies as what
 8    reaction could occur in Impax's product to form such a
 9    layer?
10    A    He doesn't talk about how that reaction occurs, no.
11    Q    Okay.
12         I'd like to briefly now walk you through the
13    manufacturing process and try to be brief.  But have you
14    prepared some slides on how Impax makes its product?
15    A    I have.
16         MR. PACELLA:  Let me go to slide seven.
17    BY MR. PACELLA:
18    Q    And, Doctor, could you -- could you please walk the
19    Court through how Impax's product is made?
20    A    Okay.
21         Okay.  So what we start with is our basic dry
22    ingredients that are blended in a dry blender.  And then we
23    transfer to a mixer that allows us to add the water, sodium
24    chloride solution to moisten the powder.  The powder is now
25    moistened to a state a little bit dryer than what you have

1    -- you would have for pasta.  When you're making it at home,

2    I don't know whether you ever make egg noodles or pasta.

3    And then we push it through an extruder.  Which crudely

4    looks like a meat grinder.  It has a force, it pushes it

5    through some tiny holes.  This almost spaghetti like strand

6    comes out, there's a blade that spins it, cuts it into

7    pieces.  Those pieces are then rounded as best we can in a

8    sphereonizing and those result in active core seeds that are

9    died.

10   Q    Okay.

11        Go to the next step, please, slide eight.

12   A    Okay.

13        Now we're going to coat these seeds with our

14   delayed release coat.

15        So what Impax does is they first make a mixture of

16   30 parts water and seven parts acetone.  And they put it in

17   a container and they begin mixing it and create a vortex, so

18   they're mixing it very aggressively.

19        And then they add these three ingredients as dry

20   powders.  Because those ingredients are indeed soluable in

21   the 30 parts water, 70 parts acetone mixture that Impax

22   uses.

23        And they mix them for a minimum of ten minutes to

24   get them to all dissolve.  Once they're all dissolved, then

25   they take the talc, which is not soluable, and they add it

1    to that mixture with a vigorous stirring and they get the

2    talc to distribute.

3         Talc is very fine particle in insoluable material.

4    And then it's mixed to a uniform distribution.

5         That material is then pumped into the sprayer

6    dryer -- I mean the spray coater.  The beads have already

7    been installed in there.  And as the material liquid is

8    pumped in from the bottom and sprayed in, it coats the beads

9    over time and eventually you get the delayed release coated

10   seeds.

11   Q    Okay.

12        Before we move off of this one to the next step,

13   why -- what is the purpose of using 70 percent acetone, 30

14   percent water as the solvent?

15   A    Okay.

16        What you want to try to do is get all the soluable

17   ingredients to dissolve.  And at the same time not have your

18   coating solution adversely affect the surface of the core

19   seed.

20        And so what you often do, because water has a

21   tendency to really migrate into seeds and affect it, you

22   often use a minimum amount of water that will allow you to

23   get all those things dissolved so you can get a good coat.

24        Also, acetone evaporates more quickly than water.

25   And if you want to minimize any distribution or any changes

         1    in the nature of the core seed -- of the delayed release

         2    coated seed, you want the solvent to come off as quickly as

         3    possible.

         4    Q    Okay.

         5         What is the -- I think you mentioned that the

         6    purpose of a mechanical stirring was to create a vortex that

         7    distributed the ingredients before they were sprayed?

         8    A    That's correct.

         9    Q    Would changes in the rate of stirring that mixture in,

        10    they were adjusted during the coating process, do you have

        11    an opinion as to whether that would affect how the

        12    ingredients are distributed within the layer as it's being

        13    applied on?

        14    A    That's very good.

        15         Once we have the coating solution uniformly

        16    distributed and ready to go we start pumping it in.  As we

        17    pump it in, the level of the coating solution in our

        18    container goes down.

        19         If we get to a point where we're starting, the

        20    vortex starts to draw air into our coating solution, it

        21    causes foaming.  And that creates a problem for us in terms

        22    of the manufacturability and in the coating.  And so we

        23    might slow the stirring near the end of the coating process

        24    to allow us to have the -- continue to have the uniform

        25    coat.

```
 1    Q    Based on your knowledge and experience of Impax's NANDA,

 2    how would you characterize the way in which the four

 3    ingredients used to make this delayed release seed are

 4    distributed within that delayed release layer?

 5    A    The three ingredients are successfully dissolved in the

 6    liquid to form a homogenous uniform layer.  Talc would be

 7    distributed uniformly throughout that layer.

 8    Q    And when you say "uniformly," do you mean perfectly

 9    uniform?

10    A    Well, talc has a tendency to aggregate.  So individual

11    particles could be seen or larger aggregates within the

12    coating layer.  But they would be throughout the thickness

13    of the coated layer.

14    Q    Okay.

15         Could you move on to the next step of Impax's

16    process, which I believe is slide nine.

17    A    And this is fairly straightforward.

18         What we do is we take these beads that have been

19    successfully coated with the delayed release coat, we blend

20    them with powders.  All right?

21         And then we send it to -- through the tablet

22    machine and compress it into a tablet.

23    Q    Okay.

24         And you have up there 75 milligram, 100 milligram

25    and 150 milligrams tablets.  Is there any difference,
```

1    significant difference in the manufacturing process for

2    those three different tablets from what you just described?

3    A    The only difference is the size of the actual tablet

4    itself.  The total weight of each individual tablet goes up.

5    Q    Okay.

6         Based on your knowledge, experience and review of

7    Impax's ANDA, what is your opinion as to whether or not the

8    Impax product, the tablet, or I should say the delayed

9    release seed has a separate stabilising layer between the

10   core and the delayed release coating that is made up of what

11   Dr. Davies has said is a HPMCP derived material and is talc

12   enriched?

13   A    I think that's impossible.

14   Q    Have you ever been to Impax's manufacturing plant to

15   actually watch them make the product?

16   A    No, I haven't.

17   Q    Does that affect your opinion in any way?

18   A    No.

19        If you look at the executed batch records you can

20   see step-by-step how they go about it.  The steps they use

21   are exactly the steps I use in my own laboratory.

22        I have a pilot plant or a laboratory sized

23   equipment that matches all of this equipment except for the

24   extruder, which if someone wants to give me one that would

25   be good, so I can go about and make these products and teach

1    people how to make them.  And this process is exactly the
2    ones that we would use.

3    Q    So based on your knowledge, experience and review of
4    Impax's ANDA, do you believe that information is sufficient
5    for you to conclude what you just concluded in terms of the
6    distribution of the components in the delayed release
7    coating?

8    A    Yes.

9    Q    I'm sorry, I should say, I misspoke and I said delayed
10   release coat, I did misspeak, but let me just ask the
11   question.  I apologize.

12        From your knowledge, experience and review of
13   Impax's ANDA, does that provide you sufficient information
14   to reach the conclusion that you did concerning the
15   distribution of the four ingredients in Impax's delayed
16   release coating?

17   A    Yes, it does.

18   Q    Now, could you just -- we want to be brief, but do you
19   have experience with the types of processing steps that you
20   described that are used to make Impax's product?

21   A    I think I said already that I have that equipment in my
22   own laboratory, I use it on a regular basis, I teach people
23   how to use it.  So yes.

24   Q    Do you have an understanding of how to use the types of
25   equipment that Impax uses on a larger scale than what's in

```
 1    your lab?
 2    A    Yes.  I've visited other companies and worked with them
 3    doing scale-ups, so the basic principles of the equipment
 4    are the same and there are of course subtle differences in
 5    scale up.
 6    Q    Have you seen anything, anything in Impax's ANDA which
 7    would suggest a second layer would somehow form in Impax's
 8    delayed release coat seeds?
 9    A    No.
10    Q    Have you seen anything in the scientific literature that
11    would suggest that the processing steps would somehow lead
12    to a stabilising coat in the active core and the delayed
13    release coat of the Impax delayed release seeds?
14    A    No.
15    Q    Now, we've talked about the process all the way through
16    the making of the tablet.
17              What does Impax do next after it makes the tablets?
18    A    It packages them in a sealed container with a dessicant.
19    Q    Okay.
20              What is a "dessicant"?
21    A    A dessicant is material that draws moisture out of the
22    environment and therefore it's presence in a sealed
23    container would dry out the air in that container.
24    Q    Okay.
25              Could you look at ITX 661 in your binder.
```

```
 1              Do you recognize ITX 661?

 2   A   Yes, I do.

 3   Q   What -- what is it?

 4   A   It's the quality overall summary that was part of an

 5   ANDA 091132.

 6   Q   Is that the 150 milligram doxycycline hyclate delayed

 7   release tablets?

 8   A   Yes, I believe.

 9   Q   And does the information contained in this quantity

10   overall summary concerning the manufacturing process and the

11   composition of Impax's product consistent with what you

12   described to the Court earlier?

13   A   Yes, it is.

14   Q   Could we go to page 11 of exhibit 661.  And I'm

15   referring to dash 0011 in the lower right-hand corner.

16   A   Yeah, I'm here.

17   Q   Okay.

18              And is that where you find -- can you explain where

19   you find information that describes the composition of

20   Impax's product?

21   A   This is the beginning of it, and it says that note that

22   the subject of this ANDA is for  150 milligrams strength

23   only.  Okay.

24   Q   And where -- yes, can you just --

25   A   I'm sorry.
```

1   Q   -- provide the Court with the span of pages that

2   describes?

3   A   Okay.  So that's where that says, so that's why we know

4   it's a 150.  And then the next page lays out the ingredients

5   for all three batches.  So we can go to that.  And you can

6   see the ingredients.  Whoops.

7   Q   I just want you to describe, I'd rather just not show it

8   on the screen, has a lot of detail we don't need to get

9   into.

10  A   All right.  Okay.

11  Q   I was just trying to make it simple.  What is shown on

12  Exhibit 661, scanning from pages 11 through 13?

13  A   Yeah, the composition and manufacturing requirements for

14  the product.

15  Q   Okay.

16          And I -- let's go to page 23.

17          And is this where the manufacturing process that

18  you described on the screen is described in some more

19  detail?

20  A   Yes, it is.

21  Q   And does that go through page 25?

22  A   It goes through page 24, and then on page 25 is the flow

23  chart for it.

24  Q   Okay.

25          And that's where you drew the information for your

1    description of the manufacturing process?

2    A    Yes.  This and the executed batch records.

3    Q    Okay.

4         Let's go to the executed batch record.

5         Have you -- you know -- now, what is a executed

6    batch record?

7    A    When a product is actually made there is a batch record.

8    And the batch record starts out with a -- we call a ticket,

9    which says to the people who are going to make it, these are

10   the steps you have to follow to make this product.  And then

11   it leaves spaces for them to fill in the information that

12   they needed to have to assure that they actually did what

13   the batch record said.  And then they initial it.  So an

14   executed one would be one that had been carried out by a

15   team of formulators.

16   Q    Okay.

17        Can we go to ITX 214.

18        What is ITX 214?

19   A    Okay.

20        Okay.  So this is the executed batch record for lot

21   RO 8071.  And it's divided up into its individual segments.

22   And so this cover page says blending, but there are other

23   segments in this document that cover each of the different

24   activities.

25   Q    So does this document, ITX 214, include all of what was

```
 1    done to manufacture an actual batch of Impax product from
 2    start to finish?
 3    A   Yes.
 4    Q   And for this particular one, it's a 150 milligram
 5    tablet?
 6    A   That's correct.
 7    Q   Now, you mentioned lot RO 8071.  Have you seen that lot
 8    before in this case?
 9    A   Yes.  This is the lot that was given to Dr. Davies for
10    his testing.
11    Q   And have you reviewed the testing that Dr. Davies did on
12    lot RO 871?
13    A   Yes, I have.
14    Q   RO 8071.
15    A   Yes, I have.
16    Q   Could we go to page 37 in the lower right-hand corner.
17    And I believe there were a couple points you wanted to
18    highlight about this.  Which part of the product
19    manufacturing process does this document address?
20    A   So these are the steps involved in the coating.  And
21    step one is the blending of the two liquids.  We want to
22    look at one, two and three, if you don't mind.  Thank you.
23        So step one is where they blend the two liquids and
24    get it mixing.  All right?
25        And then step two, they add the three soluable
```

1    ingredients, which are the HPMCP and the TEC.  And they stir

2    for at least ten minutes.  And you'll see on the right that

3    the initials of the person who did it and the date when they

4    did it, and what you don't see is the person who verified

5    signs next to that.  But we just didn't pull down quite

6    enough.

7              And then you disperse the talc into the solution,

8    which is step two, and mix for at least ten minutes, and

9    continue mixing throughout the coating process, and then the

10   recorded information and again the initials of the person

11   who did the work.

12   Q    In this step two refers to that vortex that you were

13   talking about?

14   A    Yes, it does.

15   Q    Is this information that's contained in these three

16   processing steps relate to how the materials are distributed

17   within the delayed release coating?

18   A    By doing it in this way we ensure that we first develop

19   a homogenous solution, and then we get a uniform dispersion

20   of the very small particles of talc.

21   Q    Now, briefly just turn to PTX 264.  And that's probably

22   very -- in the back, towards the back of your binder.

23   A    I'll be there in a second.

24   Q    You with me?

25   A    I'm there.

```
 1    Q   Okay.

 2            What is PTX 264?

 3    A   This is a portion of an executed batch record and it's

 4    the stability batch for that RO 7134.

 5    Q   And that's a Impax 75 milligram doxycycline hyclate

 6    delayed release tablet?

 7    A   That's correct.

 8    Q   And this is relating just to the coating step, the

 9    delayed release coating step?

10    A   Yes, on 007 we have exactly the same information we saw

11    before.

12            MR. PACELLA:  Now, I think we can unseal the record

13    at this point, Your Honor.

14            THE COURT:  All right.  The record will be

15    unsealed.

16            ( Record unsealed ).

17

18

19

20

21

22

23

24

25
```

```
 1    BY MR. PACELLA:

 2    Q   Okay.

 3        Doctor, let's switch gears and talk about some of

 4    the testing that's been done in this case.

 5        Do you rely on any testing that you yourself

 6    performed in this case to reach your conclusions?

 7    A   No.

 8    Q   Have you considered testing done by others in this case

 9    in order to reach your conclusions?

10    A   Yes.

11    Q   And did you consider the testing by both Dr. Davies as

12    well as Impax's experts Dr. Sommer and Dr. Sodhi?

13    A   Yes, I did.

14    Q   And in the course of your work at the university and in

15    the past, have you had occasion to consider testing done by

16    others and evaluate that to reach conclusions similar to the

17    types of conclusions you're drawing here?

18    A   Yes.

19        As a formulator you always depend on analytical

20    services to give you information that will help you inform

21    your opinion about the quality of the formulation.

22    Q   Now, did you review the expert reports of Dr. Sodhi and

23    Dr. Sommer?

24    A   Yes, I did.

25    Q   And Dr. Davies?
```

1    A    Yes, I did.

2    Q    Were you here when doctors -- you weren't here for Dr.

3    Davies but you read his transcript?

4    A    Yes, I did.

5    Q    And you were here for Dr. Sodhi's and Dr. Sommer's live

6    testimony.  Correct?

7    A    Yes, I was.

8    Q    Based on what you've seen in this case, do you have an

9    understanding of whether the test methods Dr. Sodhi and

10   Sommer used are the types relied on by those of kill in the

11   art of pharmaceutics?

12   A    I understand that they are.

13   Q    What level of confidence do you have in the testing and

14   analyses from -- that were done by Dr. Sodhi and Dr. Sommer?

15   A    I'm very confident that they showed exactly what they

16   said they showed.

17   Q    What do you conclude after reviewing the test that Dr.

18   Sommer and Dr. Sodhi testified about?

19   A    It confirms my opinion that the manufacturing process

20   for the Impax product makes a single coated bead with a core

21   of the active ingredient and delayed release coat directly

22   in contact with it.

23   Q    Have you considered -- let's talk about Dr. Davies

24   tests.

25        Did you consider it, the optical microscopy

1    imaging?

2    A   Yes, I did, I looked at it.

3    Q   Can we take a look at PTX 214.  What is PTX 214?

4    A    It's an optical microscope image of a -- the 100

5    milligram doxycycline hyclate Impax product.

6    Q   Now, Dr. Davies has a legend that says he has a region

7    one, Roman numeral I core seed, and then he has a region two

8    coating.

9         Do you agree with Dr. Davies that that's the

10   structure indicated in this image?

11   A   Yes, I think it is.

12   Q   Have you seen any optical microscope images of the Impax

13   product in this case that showed anything other than a core

14   surrounded by a single coating?

15   A   No.

16   Q   Have you also considered Dr. Davies scanning electron

17   microscope imaging?

18   A   I have.

19   Q   Can we take a look at PTX 224.

20        Now, do you recall this?

21   A   Yes.

22   Q   Can you describe what you're seeing in this image based

23   on your opinion?

24   A   Well, this is a very small segment of the circumference

25   of a bead.  And it's a scanning electron microscope which is

1    very good at picking out morphological changes on the

2    surface of the thing it's scanning.  And you'll notice that

3    on the lower left we have the external bead -- the external

4    bead.

5    Q    Doctor, can I stop you.  I don't want to interrupt, but

6    but can you use your pointer to show what you're looking at?

7    A    All right.  I'm sorry.

8            Down here is really the outside of the bead falling

9    away from the surface where it's been cut, so this is just

10   what the bead will -- this space between here and here is

11   approximately the width or thickness of the delayed release

12   coat.  Okay?

13           And then in here of course is the core.

14           And what Dr. Davies is pointing to is some areas

15   where he says it's got talc, but you'll notice that the same

16   coloration is throughout the layer in various places.  So if

17   indeed this is talc, and there's no confirmatory test of

18   this, then we can assume that these are also talc regions,

19   because talc is uniformly distributed during the coating

20   process.

21   Q    Do you agree with Dr. Davies legend, that in this image

22   what's depicted is a core seed region A, in a coating,

23   single coating region B?

24   A    Yes.

25   Q    Do you agree with Dr. Davies that this image could be

```
 1    interpreted to indicate a layer around the core that is talc
 2    enriched?
 3    A    Well, there is talc in the entire layer.  This is a
 4    single layer, and there's talc distributed uniformly
 5    throughout it.
 6    Q    And have you seen any other SCM images in this case?
 7    A    Yes.
 8    Q    Have you seen other ones?  Did you see any SCM image in
 9    this case which in your view could be interpreted as a talc
10    enriched layer around the core?
11    A    No, I don't think so.
12    Q    Does this SCM image provide any information that would
13    allow one to conclude that what's surrounding the core
14    includes what Dr. Davies has called an HPMCP derived
15    material?
16    A    No, there's no information that would support that here.
17    Q    Can you explain why you believe that's the case?
18    A    Well, there's no analysis of the components of this that
19    would tell us whether there was HPMCP derived material.  And
20    Dr. Davies hasn't even told us what the HPMCP derived
21    material is.
22    Q    Have you seen any -- if we look at the area, maybe one
23    -- this is a two micron scale.  Can we see?
24    A    Yes.
25    Q    Let's just say this is the core.  You can't really see
```

1    exactly, but just let's say that's the core.

2            If you went three microns from the core and

3    including where this, all this stuff is, have you seen any

4    evidence from Dr. Davies that chemically analyzed what is

5    inside the region that abuts the core?

6    A    No.

7    Q    Do you agree that Dr. Davies images where he took an SCM

8    of the delayed release cross-section, delayed release impact

9    seed, and he says he washed it with acetone first, do you

10   see any evidence in any of those images that allows you

11   conclude that there's either a talc enriched region around

12   the core or a HPMCP derived material around the core?

13   A    No.

14   Q    Now, when you were -- when you opined that what you're

15   seeing in SCM three, which is PTX 224, that Dr. Davies

16   designated as having a core seed with a coating, when you

17   were opining that that does not have a delayed release -- or

18   a stabilising coat, were you -- did you have in mind what

19   the Court construed the term "stabilising coat" to be?

20   A    I tried to, yes.

21   Q    And you pointed to earlier that that definition includes

22   that, among other things, the stabilising coat must be a

23   layer?

24   A    That's right.

25   Q    And why is it your opinion that what Dr. Davies is

JOHN KEVIN STONE, CSR

1    showing in this image is not a layer?

2    A   Well, let's be clear.  He and I agree that there is a

3    layer.  But that layer happens to be the delayed release

4    coat.  That's -- and there's no additional structure in here

5    that would be anything close to what the patent claims is a

6    layer of stabilising coat.

7    Q   Now, you understand I alluded to earlier Dr. Davies'

8    reliance on a test where he first treated Impax seeds with a

9    99 percent acetone, 1 percent water mixture, and then tested

10   the surface of what remained after he shook it in the vial?

11   A   Yes, I remember that.

12   Q   Do you remember -- do you believe that Dr. Davies'

13   acetone treatment method is a scientifically reliable way to

14   analyze the structure and composition of a pharmaceutical

15   pellet?

16   A   No.

17   Q   And to your knowledge, has Dr. Davies' acetone washing

18   method for detecting an otherwise undetectable layer ever

19   been subjected to peer review?

20   A   Not that I know of.

21   Q   In your experience, have you ever heard the use of a

22   solvent washing followed by chemical analysis of the surface

23   as a method to identify an intermediate layer outside of Dr.

24   Davies' use of that concept in a litigation context?

25   A   No.

```
 1    Q    Now, you recall that Dr. Davies -- do you recall reading
 2         that Dr. Davies pointed to a particular paper and he said
 3         that described the use of this method?
 4    A    Yes, I recall.  I recall that.
 5    Q    Do you agree with that?
 6    A    No.
 7    Q    Could we go to PTX 246.  PTX 246.
 8              Do you recognize this paper?
 9    A    Yes, I do.
10    Q    Is this the paper Dr. Davies referred to in this direct
11         testimony?
12    A    Yes, it is.
13    Q    And have you read this paper?
14    A    Yes, I have.
15    Q    And can you explain, without going into too much detail,
16         but why you disagree with doctor -- what Dr. Davies, Dr.
17         Davies' statement that this publishes his method is
18         incorrect?
19    A    The authors of this paper were making microcapsules
20         using polymeric material call CAB.  CAB is soluable in
21         acetone.  They used the acetone wash to remove the CAB in
22         order to determine the weight of the coating that they had
23         applied during their application process.
24    Q    So in this paper, once the bead was washed, did the
25         authors purport to detect an intermediate layer in the
```

```
 1    product that remained after the wash?

 2    A    No.   What they did was they weighed the beads, washed

 3    them, dried them, and weighed them again, and calculated the

 4    percent weight loss, and said that that was the weight of

 5    the seed, A B bead that was coated during their

 6    microencapsulation process.

 7    Q    Do you have a slide that summarizes why, Doctor, you

 8    believe Dr. Davies non-peered acetone wash layer detect

 9    method is unreliable?

10    A    I do.

11              MR. PACELLA:   Can we see slide 10.

12    A    Okay.

13              So in order to really understand what Impax's

14    product is we have to do analysis that doesn't first destroy

15    the product.  And the acetone treatment modified the product

16    considerably.  The solvent system he used is far different

17    from the solvent system that Impax uses in order to apply

18    the polymeric material.

19              And so he's well on almost a pure acetone wash.

20    And we'll show a little while later that some of these

21    ingredients don't dissolve well in acetone at all.

22              Then his analysis focuses on a tiny fraction of the

23    surface, and I don't think his methodology would be

24    effectively reproduced, because we have no idea of the

25    length of the type of shaking, the vigorousness of it.   In
```

1    other words, it's being done by hand in a small bottle.  So
2    I wouldn't be able to do exactly the same thing that he did.
3    So I don't think it's a reasonably good design experiment.
4    Q   All right.
5         So let's focus first on why you believe Dr. Davies
6    used an inappropriate solvent if his intent was to remove
7    the entire enteric or delayed release coating.  Would you
8    have a slide that would help explain that?
9    A   Yeah, I do.
10        MR. PACELLA:  Could we go to slide 11.
11   BY MR. PACELLA:
12   Q   Dr. Davies, please explain, but there's a lot of
13   information on here, or can you try to distill it for Judge
14   Martini?
15   A   I'd be happy to.
16        What I did was I created a slide that looked at the
17   hundred percent acetone on the left and the 70-30 blend of
18   acetone, water that Impax uses in its coating process.
19        And then where it's blue I suggest that that's
20   where that material will be reasonably well dissolved in the
21   mixture.  All right?
22        Now, talc doesn't dissolve in anything.  So it's
23   all red.  TEC, triethyl citrate is freely soluable in
24   acetone, and so it would dissolve in all the mixtures
25   pictured here.

```
 1                 HPMC is a very difficult compound to get to
 2       dissolve.  But it is soluable in water.  But you need to be
 3       able to prepare it in a way that it will hydrate efficiently
 4       and then go into dissolution.  And we know that HPMCP can
 5       dissolve in 95 percent acetone, 5 percent water, and is
 6       insoluable in pure acetone.  And we don't know how much
 7       solubility we can get, but what he's done is he's gone to
 8       the extreme end, and so even some of that wouldn't dissolve
 9       efficiently in whatever his mixture was.
10                 So if he really wanted to get the coat completely
11       washed off, he would need to have moved down to, closer to
12       the Impax 30-70 mixture.
13       Q   Now, where did you get the information about the various
14       soluabilites of the compounds that you used to put together
15       this demonstrative?
16       A   I looked at the four monographs that are in the Handbook
17       of Pharmaceutical Excipients.  And across the bottom of that
18       chart lists where they are in the exhibit list.
19                 So ITX 632 are 24, 26, 44 and 52, are the
20       monographs for the four ingredients out of the handbook.
21       And then we looked at Shin-Etsu, who makes HPMCP and HPMC as
22       back up information, and they're listed here I believe as
23       668 and 669.
24       Q   Where did you get the information about the solubility
25       in 70 percent acetone, 30 percent water?
```

JOHN KEVIN STONE, CSR

```
 1    A    Okay.  We got that from the batch records and the QOS
 2    from the Impax ANDA.  And I think that's 214-35.
 3    Q    And I believe that's one of the exhibits we looked at
 4    previously, the Impax record?
 5    A    Yes, it is.
 6    Q    In terms of the monographs, you mentioned the four of
 7    them.  Those are all contained within the compilation of the
 8    Handbook 2 Pharmaceutical Excipient references that you
 9    referenced earlier at ITX 632?
10    A    They are.
11    Q    Now, we'll talk about the other two references.  But in
12    terms of the HPMC, you don't have something like this that
13    says 95-5.
14             Now, in your expert report did you cite a reference
15    that at that time at least in your expert report you
16    indicated showed that you needed at least 10 percent water
17    to dissolve HPMC?
18    A    I did.  I apologize for that.
19             I went back to the reference and there is no
20    specific data, but it's been my experience if you don't have
21    at least 10 percent water, very, very difficult to get it to
22    go into dissolution.
23    Q    Okay.
24             So now let's look at ITX 669.
25             Do you recognize that?
```

1    A    Yes.   That's for HPMCP, it's the Shin-Etsu package

2    information or advertising information about their product.

3    Q    And can you point out where the solubility information

4    that's relevant to your discussion is indicated?

5    A    It's in a table in there.   I'll have to find the page

6    number.

7    Q    I believe it's --

8    A    There we go.   There we go.

9    Q    -- page five.

10   A    Thank you.   Wonderful.   Page 5.

11   Q    Now, what does page 5 say about the solubility of HP 50

12   in acetone?

13   A    Okay.

14        So what the chart does, it tries to give you an

15   idea of what solvents would work well with the particular

16   polymers.   And if you look, it says acetone, water, 95-5,

17   and it has a circle, and the circle says soluable.   Which

18   means that HPMC, HP 50, which is the polymer in question, is

19   actually soluable in acetone, water, 95, this line here.

20   Okay.   Okay.   Good.

21        It also says that acetone does not necessarily

22   dissolve it.   It allows it to swell or there is some partial

23   solubility.   Okay.

24        And there's several ways of interpreting that.   But

25   from reading of the Handbook of Pharmaceutical Excipients

1      they would say that it swells and we can go back to their

2      definition.  Okay?  But partial solubility means that some

3      of it might dissolve.  Polymeric mixtures like this, because

4      they are polymeric, have different molecular sizes.  All

5      right?

6              So that as you make the material, because it's made

7      from cellulose, and it's derived, you can have much smaller

8      molecular sizes and much larger molecular sizes.  And I

9      think that what they're trying to get at --

10             MR. SEPHTON:  Your Honor, I would object, like to

11     object.  This is not in the expert report or in his

12     deposition.  I asked him about this brochure --

13             MR. PACELLA:  Your Honor, --

14             MR. SEPHTON:   -- particularly --

15             THE COURT:  Hold on.  Let me hear the --

16             MR. SEPHTON:   -- the discussion about molecular

17     weight having the affect on solubility, not raised at all

18     previously.

19             THE COURT:  Is it in his report?

20             MR. PACELLA:  This specific, no, Your Honor,

21     clearly the expert report covers the variable soluabilites

22     and all that, and in the deposition I believe there are 10

23     pages about this issue.

24             THE COURT:  All right.

25             Then leave it too.

1            The objection will be sustained.

2    A    Fine.

3    Q    Okay.

4            So, Dr. Kibbe, in terms of -- there's been some

5    discussion about the difference between what this document

6    says, swelling, or partially soluable in 95 percent acetone

7    for HPMCP, and what the handbook says, which we can go back

8    to it.  But I believe the fact that it says insoluable, does

9    that sound correct?

10   A    The handbook said swellable and insoluable.

11   Q    So does the fact that the handbook said swellable or

12   insoluable, and that this reference says swelling or

13   partially soluable, does that affect your opinion that Dr.

14   Davies' use of 99 percent acetone was inappropriate?

15   A    No.  I think even if there was some partial solubility

16   he wasn't using the best solvent mixture in order to get

17   this material to dissolve.

18   Q    And if you wanted to successfully remove the coating,

19   the delayed release coating that was applied to Impax's

20   product completely down to the core, what solvent would you

21   use?

22   A    Well, I would go back to Impax's blend and use a 70-30

23   acetone-water wash myself.

24   Q    And you didn't conduct that experiment, did you?

25   A    No, I didn't.

1    Q    Why not?

2    A    I didn't think there was any value to it.  I didn't

3    think it showed anything.  And I think the experiment itself

4    just changed the nature of the coating that was already

5    applied and was clearly a single delayed release coat.

6    Q    Is there a difference between trying to dissolve a

7    single substance many HPMCP when it's a powder and you're

8    just dissolving that on its own, versus trying to dissolve a

9    mixture of a polymeric film that's been applied to a --

10   that's been applied?

11   A    Yes.

12   Q    Can you explain?

13   A    The -- the solubility of something is a thermodynamic

14   measure, and it measures how much will go in in any given

15   amount of solvent.

16        Dissolution, how fast it dissolves, is a function

17   of other variables.  And one of them is the particle size or

18   the size of the surface exposed to the solvent.  And the

19   other is how complex is that material.

20        And so in order to dissolve all three of these

21   things off, you have to have a solvent that will work on all

22   of them at the same time.

23   Q    And Dr. Davies defended his choice of solvent for the

24   acetone washing experiment based on his position that it was

25   a more dilute solution in the testing conditions that were

1    used for this reference.  Do you recall that?

2    A    Yes.  I do.

3    Q    Do you recall -- do you agree that that's a basis to

4    expect that Dr. Davies' choice of solvent was a correct one?

5    A    No, I don't think so.

6    Q    Can you explain?

7    A    Well, first, we're not sure whether all of the HPMCP

8    would dissolve anyhow, because it's swellable and partially

9    soluable.

10        Second, we don't have any real reliable data on

11   HPMC and how well it will re-dissolve in acetone or pure

12   acetone.

13        But when you look at this chart you say, okay,

14   acetone or 95 percent acetone, 5 percent water, I think

15   you'd be more inclined to go with the 95-5 at a minimum.

16   Which is five times as much water as Dr. Davies used.

17   Q    Okay.

18        Can we go to ITX 668.

19        THE COURT:  Did Dr. Davies, I don't recall, I don't

20   think he did, in any of his testing, in terms of his

21   attempting to dissolve the tablet, he never changed the

22   solution, did he?  He never changed it from 99 to one?

23        THE WITNESS:  No, that's correct.

24        MR. SEPHTON:  He used a ratio of one of these

25   washes --

```
1                 THE COURT:  I know.  He did it over times, five,
2      10, 15, 20.
3                 MR. SEPHTON:  But it was 99 percent acetone, 1
4      percent water.
5                 THE COURT:  Right.
6                 Now, had he changed that ratio, do you have an
7      opinion as to whether that might have changed the amount of
8      coating that was dissolved?
9                 THE WITNESS:  I think if you went to a better
10     solvent.
11                THE COURT:  Better being more water?
12                THE WITNESS:  More water.  Because --
13                THE COURT:  What you just said, that's it?
14                THE WITNESS:  Yes.
15                THE COURT:  So your opinion would be he didn't do
16     this test, but if the solvent itself was changed to a ratio
17     of let's say 80-20, that might have had an affect on the
18     amount of the layer that was dissolved.  Is that correct?
19                THE WITNESS:  It would assist to get the layer
20     dissolved, and I also would argue that it would be best to
21     do it with a constant stirring --
22                THE COURT:  Okay.
23                THE WITNESS:  -- system, rather than just shaking
24     it.  From what I understand, one of his colleagues just
25     shook it, and I would prefer to have it done it in a flask
```

```
 1    with a stirring bar and a, you know, more consistent way

 2    of --

 3              THE COURT:  In your opinion, would it be the best

 4    ratio if you had to pick a ratio, again there's no -- Dr.

 5    Davies picked a ratio of 99 to one.  Correct?

 6              THE WITNESS:  Yes, he did.

 7              THE COURT:  But if you were to have done this and

 8    you had to pick a ratio, I think your opinion, you would

 9    pick 70-30 because that was the same mix as to when they

10    made the coating?

11              THE WITNESS:  Yes, I would.

12              THE COURT:  And you think by doing the same mix

13    there's a greater likelihood more of the coating, if not all

14    of it, would have come off?

15              THE WITNESS:  Yes, that's what I believe.

16              THE COURT:  So you have a variable about what the

17    solution should be.

18              THE WITNESS:  Yes.

19              THE COURT:  You have a variable of how long the

20    mixing should go.

21              THE WITNESS:  That's correct.

22              THE COURT:  You have the variable of how it should

23    be mixed.  Is that correct?

24              THE WITNESS:  Yes.

25              THE COURT:  You -- I mean whether it's stirred or
```

```
 1    shaken or --

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  Okay.  Thank you.

 4              Go ahead.

 5              MR. PACELLA:  Thank you.

 6              Could we have ITX 668.

 7    BY MR. PACELLA:

 8    Q  Dr. Kibbe, could I refer you to ITX 668.

 9              THE COURT:  By the way, is there anything in any

10    established scientific literature that Dr. Davies could have

11    referred to to figure out what the proper ratio, stirring

12    and/or time would have been?

13              THE WITNESS:  I believe that if you go to the

14    handbook and look at the solubility profiles it's a good

15    place to start.

16              THE COURT:  That was that --

17              THE WITNESS:  Exactly.

18              THE COURT:   -- this is this, what we just had,

19    this chart?

20              THE WITNESS:  Right.

21              And so he could have started with 95-5.  But the

22    problem with 95-5 is it works really well for HPMPC.  But we

23    know that HPMC is even more water loving as it were, and so

24    you probably would want to have more water.  You could do a

25    comparative test, Your Honor, if you really -- you're really
```

```
 1            determined, and take some beads and do it at 95-5 and some

 2            at 90-10 and some, and eventually find the correct blend.

 3                     THE COURT:  Before -- before learning about Dr.

 4            Davies doing this solubility test, had you ever heard of it

 5            being done to determine what the coatings were of a

 6            pharmaceutical pill?

 7                     THE WITNESS:  No.  This is HPMC, it's hypromellose

 8            and it's Phamacoat, Shin-Etsu brochure, and I think the

 9            reason we want to --

10            BY MR. PACELLA:

11            Q   Can I just stop you there, I just want to put on the

12            record that what we're talking about, ITX 668, and you just

13            identified that as the Shin-Etsu brochure for HPMC

14            Pharmacoat?

15            A   That is correct.

16            Q   All right.

17                     And I just want to ask you, what is the relevance

18            of how does this -- what does this tell you about the

19            solubility of HPMC?

20            A   We all know that Pharmacoat, HPMC is soluable in water,

21            but it has some unique properties.  It's inverse in terms of

22            temperature.  The warmer the water is, the less soluable it

23            is.  The colder the water is, the more soluable it is.  If

24            you try to mix it in cold water, right away it has a

25            tendency to aggregate and clump and you end up with lumps
```

1        like you would lumpy gravy.

2               So the techniques to get it to go into dissolution

3        require you to somehow disperse it in a relatively poor

4        solvent, and then have it gradually hydrate to become a

5        uniform mixture.  And so the 70-30 mixture of acetone-water

6        is a relatively poor solvent for Pharmacoat.  But allows it

7        to be distributed and gradually hydrate and go into

8        dissolution over time.

9        Q   And how does that relate to your conclusion that Dr.

10       Davies used the wrong solvent to attempt to wash off Impax's

11       delayed release coating?

12       A   I have no data to support this directly, but it's my

13       opinion that there wasn't enough water in his acetone-water

14       mixture to successfully dissolve the HPMC.

15       Q   And what's the basis of that opinion?

16       A   Because it's water soluable.  And so in order to get it

17       to go into dissolution, you first distribute it in a

18       non-solvent situation and then you allow that solvent to

19       take over and get it to go into dissolution.  It's a

20       difficult thing to work it.

21               THE COURT:  Counsel, how much more do you have on

22       your direct?

23               MR. PACELLA:  Your Honor, I believe, I'm more than

24       halfway, but I did have a lot of material to cover.

25               THE COURT:  All right.

1                    Then we'll recess for lunch.  We'll be back at

2       1:15, please.

3                    MR. PACELLA:   Thank you, Your Honor.

4                    THE COURT:   Thank you.

5                    We're in recess.

6                    ( After a luncheon recess court resumed ).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25